Alexander vs. Worthington, et al.

---

## Thomas S. Alexander vs. Sarah M. Worthington and William Worthington, an infant, by his next friend.

Under the act of 1835, ch. 380, any one defendant may, after filing his answer, appeal from an order granting an injunction without waiting for the answers of his co-defendants; and on such appeal this court is confined to the case made by the bill, and does not examine the answer.

The act of 1849, ch. 229, leaves the case of a will made by a testator who had died prior to its passage to be governed by the ancient law.

It subjects to the operation of the new rule a will made by a testator dying after its passage and before the 1st of June 1850, only when he has expressed the intent that the will shall pass all the estate which he might have at the time of his death.

It applies the new rule to every case of a will made perfect by the dying of the testator after the 1st of June 1850, unless a contrary intent shall appear; and the class of wills made after its passage by testators dying before the 1st of June 1850 are embraced within the equity of its second section.

The case of *Magruder and Tuck, vs. Carroll, et al.,* 4 *Md. Rep.,* 335, only decides that the first section of the act of 1849, ch. 229, governs the case of a will of a testator dying after the 1st of June 1850, although it may have been made prior to that day, and that case is affirmed and approved.

The language of a statute is its most natural expositor, and where the language is susceptible of a sensible interpretation, it is not to be controlled by any extraneous considerations.

Alexander vs. Worthington, et al.

The construction is to be on the entire statute, and where one part is susceptible of two constructions and the language of another part is clear and definite, and is consistent with one of such constructions and opposed to the other, that construction which will render all clauses of the statute harmonious must be adopted.

Where the letter of a statute is inconsistent with itself, an intent may be gathered by considering the mischief and the remedy proposed to be introduced, but what the mischief and remedy are must be collected from the statute itself.

The courts cannot imagine an intent and bind the letter of the act to it, nor indulge in the license of striking out and inserting and remodeling with the view of making the letter express an intent which the statute in its original form does not evidence.

Every construction is vicious which requires great changes in the letter of the statute, and of several constructions that is to be preferred which introduces the most general and uniform remedy.

All that is necessary in this State to render the decision of the Court of Appeals authoritative on any point decided, is to show that there was an application of the judicial mind to the precise question adjudged.

But general views expressed by the court as illustrative of, but not necessarily leading to, the opinion on the point intended to be decided, are not to be treated as conclusive when similar topics come up directly for judgment.

Lands descended are first applicable in payment of debts in relief of personal estate specifically bequeathed.

The specific legatee of a chattel of peculiar value, as a household slave, has an equity to restrain the executor, who is also the heir at law, from applying that chattel to the payment of debts for the purpose of protecting his inheritance, the creditors *being passive* and content to take payment out of either fund.

APPEAL from the Circuit Court for Baltimore city.

This appeal was taken from an order of the court below granting an injunction upon a bill filed by the appellees against the appellant and others, represented to be the heirs at law of Michael B. Carroll, deceased. The allegations of the bill and all the facts of the case are fully stated in the opinion of this court.

The cause was argued before LE GRAND, C. J., ECCLESTON and MASON, J.

*Thos. S. Alexander* for the appellant.

The act of 1835, ch. 380, enables any one defendant, on filing his answer, to appeal from an order granting an injunc-

tion. 7 *Gill*, 109, *Barnes vs. Dodge.* The appellant has filed his answer, which is unexceptionable. His appeal is therefore rightly taken.

If we refer to the answer it will appear, that a due regard for his own safety has compelled the appellant to exercise his right of appeal. The heirs at law of Carroll have filed their bill against him in the circuit court of the United States, to compel him to convey the land in question to them. And since the filing of the answer, an injunction has been issued at their instance, to restrain him from making a conveyance to the appellees, who claim under the devise to Mrs. Carroll. Now the appellant is a mere trustee of the legal title for the true representatives of Carroll's interest in the land. And the utmost that ought to be asked of him, is, that he shall preserve the legal title for the rightful owners, when they shall have been ascertained. Yet he is made the material defendant to two suits instituted by the rival claimants in different courts: and those suits are so prosecuted that he cannot execute any decree which may be passed by either court, without exposing himself to the censure of the other. He has not been instrumental in producing this state of things. Nor is there any principle on which he could be expected to waive his privilege of having an early hearing.

The act of 1835 requires the court at the first term to which the case is transmitted, to determine the appeal. He has a perfect right, therefore, to demand a hearing at this moment.

There is nothing in the act, or the practice of this court requiring him to give notice of his appeal to any other party to the suit. As a measure of precaution however, he has given notice to the counsel for the heirs at law of his purpose to urge a hearing of this appeal at the earliest moment; and he accompanied his notice with an offer to authorise them to appear and argue the appeal on his behalf. Indeed, those heirs at law ought to have filed their answers and united with the appellant in this appeal, and as they are the parties materially interested in the event they might fairly ask leave to participate in the discussion. It was to avoid any technical difficulty that the tender was made to them.

The merits of the injunction depend exclusively on the true construction of the act of 1849, ch. 229: and the question is presented as fully and fairly by the present record, as it can be in any future stage of the cause. Did the will of Michael B. Carroll, deceased, operate to pass the land in controversy to his widow and devisee, Mrs. Carroll? The appellees here, who are complainants below, maintain the affirmative, and rely upon the decision of this court, in *Magruder vs. Carroll*, 4 *Md. Rep.*, 335. If they can show that the land was validly devised to Mrs. Carroll, they have succeeded to her title, and it must be admitted, are entitled to their injunction to prevent the appellant from conveying the title to other parties. On the other hand the heirs at law of Carroll deny the title of Mrs. Carroll, as devisee of her husband, and they rely on the decision of the Supreme Court, recently made in *Carroll vs. Carroll's Lessee*. On this hypothesis the injunction was improperly granted. The appellant is not bound to decide between such authorities. But finding the case ripe for an appeal, and instructed that the Supreme Court acknowledges the authority of this court as the ultimate expositor of all statutes concerning the title to lands within this State, he asks that his duty may be expressed in terms which cannot be mistaken; and with an authority which will require and justify his implicit obedience. He submits the appeal upon the decision of the Supreme Court, and, relying on its correctness, asks for a reversal of the order from which he has appealed.

*Wm. Schley* for the appellee.

The sole question in this case is, whether the will of the late Michael B. Carroll, dated the 10th of September 1837, is to be construed and have effect, pursuant to the act of 1849, ch. 229, as if executed immediately before his death, which occurred on the 30th of August 1851?

It is admitted that the opinion and decision of the Supreme Court of the United States, in the case of *Carroll vs. Carroll's Lessee*, recently decided, that the act does not apply to this will, but with all becoming respect for that exalted tribunal it is insisted that their construction of the act of 1849 is not

correct, and is contrary to many decisions of high authority; and that if the question was *res integra* in this court, the opinion of the Supreme Court ought not to be adopted.

But the point is *res adjudicata* in this court. It has been decided in the case of *Magruder, et al., vs. Carroll, et al.,* 4 *Md. Rep.,* 335. The question was elaborately argued and deliberately decided in that case. That decision is *final,* and in case of conflict this court should adhere to its own decision. 23 *Miss. Rep.,* 496, *Shelton vs. Hamilton.* Besides this, the Supreme Court erroneously supposed that the construction of the act of 1849 was not necessarily involved in the case of *Magruder and Tuck, vs. Carroll, et al:* otherwise that court, in accordance with its settled practice, would have followed the decision of this court in the construction of a Maryland statute of a local character.

ECCLESTON, J., delivered the following opinion:

In the case of *Magruder and Tuck, vs. Carroll, et al.,* 4 *Md. Rep.,* 335, the question, whether, under the act of 1849, ch. 229, the will of Michael B. Carroll passed his real estate acquired subsequently to the date of his will, was elaborately argued by counsel for the respective parties as a question legitimately presented by the record. The court likewise so considered it. And having been informed that the circuit court of the United States for the Maryland district had so construed the statute as to decide that its provisions did not affect this will, the Court of Appeals examined the subject with great care and deliberation. After much reflection, since the decision then made, I still think this court then gave a proper construction to the statute. Fully impressed with this belief, I concur with my brethren in the propriety of adhering to our construction, and therefore unite with them in affirming the order passed in this cause by the circuit court for Baltimore city. But I do not deem it necessary to express any opinion as to what should have been the decision of this court, in the former case, if we had given a different construction to the statute.

LE GRAND, C. J., delivered the opinion of this court.

This appeal is taken from an order of the circuit court for Baltimore city, granted on a bill filed by the appellees against the appellant, and certain other persons represented to be the heirs at law of Michael B. Carroll, deceased, whereby an injunction was directed to be issued against the appellant, to restrain him from making a conveyance of a tract of land, described in the bill, to the said heirs at law.

The bill states in substance, that Michael B. Carroll, lately deceased, in his lifetime, purchased a tract or parcel of land in Prince Georges county, of the appellant, Alexander, as trustee, &c., for the sum of $20,000, or thereabouts; and that the said purchase money had been paid in part by Carroll in his lifetime, and the residue by his administrators, since his death. That on the 10th of September 1837, Carroll made his last will, whereby he devised the residue of his real and personal estate to his wife, Jane M. Carroll. That he died on or about the 30th of August 1851, leaving Mrs. Carroll surviving him; who thereupon entered into possession of said land, claiming the same as devised to her by the will of her deceased husband. That she died in September 1853, leaving a last will by which she devised said land to the complainants, that is, to Sarah M. Worthington for life, with remainder over to said William Worthington in fee. And that they have entered upon said land. They pray that the appellant may be required to convey the same unto them according to their several and respective interests therein, as devisees of Mrs. Carroll. They state further, that the heirs at law of Michael B. Carroll deny the right of the complainants to said land, and claim that the conveyance thereof ought to be made to them; and therefore pray an injunction may be granted to restrain the said Alexander from conveying said land to the said heirs at law, or to any other person or persons, to the prejudice of the complainants.

On this bill an injunction was granted. The appellant filed his answer, in which he admitted most of the facts in the bill; but states that in a cause properly before this court, and involving the question involved in this cause, it was ad-

judged that the last will of Michael B. Carroll, had validly devised all the real estate of the testator to his widow; but on the other hand the Supreme Court of the United States, have recently decided that the said last will had no operation or effect on the land purchased by the testator after the date of his will. He says, also, that the heirs at law, or some of them, have filed their bill in the circuit court of the United States, against him and the present complainants, praying that he, the said Alexander, may be required to convey to them the land in controversy in this suit. He submits the question of right to the court; but denies the equity of the present complainants to an injunction, which would restrain him from making a conveyance, in obedience to a decree of the circuit court of the United States, in case such decree should pass, unless the State court can protect him from the consequences.

Although but one of the defendants has appealed from the order granting the injunction, the appeal is properly before us. The 3rd section of the act of 1835, chapter 380, provides, "That where any injunction shall issue from the court of chancery, or any county court as a court of equity, the defendant or defendants in the case, *or any of them*, may appeal, the answer or answers of such appellants being first filed, from the order of the chancellor granting the injunction, or refusing to dissolve it, to the Court of Appeals of the Shore where such injunction shall have issued, and the said court at the first term to which the case shall be transmitted, shall determine the said appeal, and shall pass such an order in the premises as to it may seem right." The Court of Appeals in the case of *Barnes and Lynch, vs. Dodge*, 7 *Gill*, 109, held that under this section of the act of 1835, a defendant who has answered the bill for an injunction, may appeal from the granting or refusal to dissolve it upon motion, without waiting for the answers of his co-defendants; and in the case of *Wagner and Marshall, vs. Cohen*, 6 *Gill*, 97, it was declared, that upon an appeal under the act of 1835, chapter 380, from the granting of an injunction only, this court is

confined to the case made by the bill or petition and does not examine the answer.    We refer to these authorities for the purpose of showing, that the question presented by the bill of the appellees is directly presented for our adjudication.

The case involves the construction of the act of 1849, chapter 229, relating to devises, which, it was supposed had been settled by the decision pronounced in *Magruder and Tuck, vs. Carroll*, 4 *Md. Rep.*, 335.    The Supreme Court of the United States, in the case of *Carroll vs. Carroll*, have decided that the decision by the Court of Appeals of Maryland, is not to be treated as a judicial exposition of the act, and has given to the act a construction the reverse of that which was expressed by this court.    It now remains for this court to determine, whether the ultimate jurisdiction to settle the construction of the statutes of Maryland, relating to the conveyance of land situate within this State, resides in this court, or in the Supreme Court of the United States; and also, whether the decision in 4 *Md. Rep.*, will be adhered to.

The decision of the Supreme Court affirms two propositions:

1st. That the act of 1849, chapter 229, sec. 1, extends only to wills made after the first day of June 1850.

2nd. That the Supreme Court are at liberty to disregard the decision of the Court of Appeals of Maryland, by which a different construction is given to that act.

Whatever diversity of opinion may be entertained as to the true construction of the first section, all must concede that the letter thereof is susceptible of the construction placed thereon by the Court of Appeals.    Punctuated as it stands on the statute book, it reads thus:    "Every last will and testament, executed in due form of law, after the first day of June next, shall be construed with reference to the real and personal estate comprised in it, to speak and take effect as if it had been executed on the day of the death of the testator or testatrix, unless a contrary intention shall appear by the will."

In the next place from a general view of the act, we must infer that the legislative intent was:

1st. To leave the case of a will made by a testator, who

had died prior to the passage of this act, to be governed by the ancient law :

2nd. To subject to the operation of the new rule, a will made by a testator dying after the passage of the act, and before the 1st day of June 1850, only when the testator has expressed the intent, that the will shall pass all the estate which he might have at the time of his death.

3rd. To prescribe a new rule which should apply to every case of a will made perfect by the dying of the testator after 1st of June 1850, unless a contrary intent should appear.

Now the intent thus collected from the general considerations of the mischief to be remedied, and the remedy proposed to be applied, can be fully gratified by giving to the first section the construction which has been placed on it by the Court of Appeals, and by embracing within the equity of the second section the limited class of wills made after the passage of the act, by a testator dying before the 1st of June 1850. On the other hand, the construction given to the act by the Supreme Court, excludes that limited class, as well from the letter, as the equity of the section; and all wills made before the 1st of June 1850, except the particular class of cases provided for by the letter of the second section, are left utterly without remedy. The intent of the legislature is, therefore, in a great degree, defeated, and the remedy which was designed to be general, is limited to special cases, which are selected on principles which disregard equally the intent and letter of the statute.

Thus, if the testator devised all his estate which he may leave at the time of his death, and the will was made before the passage of the act, and the testator died before the 1st of June 1850, his intent will be gratified. But, if the will had been made the day after the passage of the act, and the testator had died the day before, or the day after the 1st of June 1850, or if the will being made before the passage of the act, the testator had died after the 1st of June 1850, in any and every such case his intent, thus plainly expressed, would be disregarded. And what is the course of reasoning by which the Supreme Court have been led to prefer a construction of the act which thwarts the intent of the legislature, and introduces literal and

anomalous distinctions, to a construction which is equally consistent with the act, and, which would gratify the intent, and render the law uniform and consistent?

It said, that upon the construction adopted by the Court of Appeals, the act "would change the legal operation, not only of existing wills, but of those which had already taken effect by the death of the testators."

Now the Court of Appeals have decided only that the first section of the act governs the case of a will of a testator dying after the 1st day of June 1850, although it may have been made prior to that day. Is it a necessary conclusion, that it must equally embrace the case of a will made by a testator who died a century ago? Is there not, on the contrary, a sensible and clearly defined difference between the two cases? The distinction is stated in the cases reported in 12 *Metcalf*, 169 & 262, with a perspicuity and cogency of reasoning, which will not suffer by comparison with the decision in 9 *Iredell*, 288. A will is ambulatory during the testator's life. It is made perfect and operative by his death. After that event, the title of the devisee becomes vested, and a subsequent statute which would retroact on that vested right, may be deemed inconsistent with natural equity. But no such objection lies against a statute which affects to change the construction or operation of a will made at the time by a testator then in being, and who has the capacity of changing his will; and especially where the object of the statute is to gratify the intention by subordinating a rule of law "hitherto inflexible," to the intent, and where the operation of the statute is postponed, to a day future, within which the testator may accommodate his will to the existing state of the law.

But, in the judgment of the Supreme Court, "the interpretation put by the Supreme Court of Massachusetts on the statute of that State, was attended with none of the difficulties which beset the construction of the statute of Maryland, contended for by the counsel for the devisees." The decisions made by the court of Massachusetts are considered to be "a departure from an important principle," the vindication of which was attended with "some effort." The import of this

Alexander *vs.* Worthington, *et al.*

last expression, in its personal application, and its entire propriety as parcel of the judgment of the most dignified judicial tribunal in this land, must be left to be settled between the court by which the imputation is uttered and the court against which the imputation is cast. We accept it as an intimation, that if the construction of the statute of Massachusetts should ever come in judgment before the Supreme Court, the decisions in question will be overruled. It would have been more satisfactory to the profession, if the Supreme Court had made an "effort" to explain the grounds of their dissatisfaction with the decisions of the court of Massachusetts. Would the Supreme Court ignore the distinction between the title vested in the devisee by the death of the testator, and the inchoate and impalpable possibility of title of one named as an object of bounty in a will, the maker of which is still in being? Do they mean to deny the right of the legislature to provide by law, passed after the making of the will, that a testator may dispose of after acquired lands by a will plainly and manifestly declaring an intention to do so? Or, that a court of justice should feel any doubt in giving effect to a law having such object in view, and expressing its purpose in language which "could only operate in furtherance of the intention of the testator, and could never defeat that intent? "The verbal differences between the Massachusetts statute and that of Maryland, are very apparent. The court of Appeals has only adopted the principles of construction enunciated by the court of Massachusetts, as applicable equally to both cases, and a great "effort" would be necessary to discriminate clearly and satisfactorily between them.

In Massachusetts, as in Maryland, the English rule prevailed, viz., that a will would not pass title to after acquired lands, and the object of the two statutes was to change this rule. In Massachusetts the object was to be effected by providing "that the lands acquired by a testator, after the making of his will, shall pass thereby, if such shall clearly and manifestly appear by the will to have been his intention." In Maryland the provision is, "that a last will shall be construed with reference to the real estate comprised in it, to speak as if it had been executed on the day of the death of the testator, unless a contrary

61    v. 5

intention shall appear by the will." Each law confers on the testator a new power or capacity, and clothes the will with a new operative quality. Thus far the statutes are coincident in their object and effect. In the application of either law to a particular case, a question of construction arises. To bring a case within the purview of the Massachusetts law, it must appear affirmatively that the testator intended to dispose of his after acquired land. Under the Maryland law, it is to be presumed he so intended, unless the contrary intention shall be expressed. One law casts the *onus* on the devisee; the other on the heirs at law. If the concluding words of the Maryland act, "unless a contrary intent shall appear," were replaced by the words from the Massachusetts statute, "if such clearly and manifestly appear to have been his intention," no "effort" whatever could have drawn a sensible distinction between the two cases. But the analogy between the statutes, which induced the Court of Appeals to suppose that the principles of construction which had been applied in Massachusetts to the one, were just as applicable in Maryland to the other, seems to have been overlooked. In Massachusetts the statute conferred on a will, antecedently executed, an operative and effective quality, which the will did not possess at the time of its execution. And this construction is vindicated by the "broad and general" language of the act, and the absence of anything "in the words or subject matter of the act, to lead the court to a more restricted construction." Now, it may be submitted that the language of the Maryland act is just as "broad and general," unless indeed it be assumed, that the time mentioned in the act, is to be taken as parcel of the instrument described. Upon this hypothesis, which assumes, however, the very matter to be demonstrated, all discussion would have been unnecessary. The question debated would be resolved by its very statement.

The next objection urged to the construction given to the act by the Court of Appeals is, "that it would make the same will, if offered on the 2nd day of June, operative to pass after acquired land to a devisee, though, if offered in evidence on the next preceding day, it would be inoperative for that purpose." And it is said that "so to interpret an act concerning

wills as to cause those instruments to operate without regard
to the intent of the testator, having one effect to day and
another to-morrow, would not only be arbitrary and a viola-
tion of the principles of natural justice, but in conflict with
what must be presumed to have been the leading purpose of
the legislature in passing the law, the better to give effect to
the intent of the testator." Now it is to be observed, that
the Court of Appeals does not make the construction to be
given to the will to depend in any manner on the time
of offering it in evidence. Its construction, operation and
effect, are to be determined by the law existing at the time of
the death of the testator. The construction which would be
given to it on the day of the death of the testator, if it could
then come under judgment, is ever after to be given it. In
the next place it is to be noted that the objection, whatever
may be its value, is just as applicable to the Massachusetts
law as to the Maryland law. In Massachusetts the statute
was to go into effect on the 1st day of April next succeeding
its adoption. A will made before the adoption of the statute
could not at the moment of the execution have operated on
the title to after acquired land. Nor would it have operated
on such title in case the testator had died at any time before
the adoption of the act, or after that event, and before the
day on which it was to go into operation. If, however, the
testator survived that day, it is adjudged that the will would
pass the after acquired land. The objection was therefore
disregarded by the Supreme Court of Massachusetts; and,
again, the legislature of Maryland must have considered and
wittingly passed by the objection. According to the second
section, as construed by the Supreme Court, a will made before
the passing of the act by a testator dying after the passing of
the act, and before the 1st day of June 1850, would pass
after acquired land. But, if he died before the passage of
the act, or after the 1st day of June, then such after acquired
land would not be affected thereby. Upon the whole, then,
the letter of the first section is susceptible of the construction
given it by the Court of Appeals; and that construction is

sustained by the decisions in Massachusetts, and best advances the intention of the legislature. The second section removes all doubt as to the proper construction of the preceding section. It must be apparent from the letter of the second section:—

1st. That the legislature was aware that the language of the first section would embrace wills made before the passage of the act.

2nd. That the legislature intended that all antecedently executed wills should remain subject to the provisions of the first section, excepting a particular class, which were conditionally excepted.

3rd. That the special class enumerated in the second section, (if the testator's intent was sufficiently manifested,) were to *remain* subject to the operation of the first section; and

4th. Were to remain so subject, because they were "last wills and testaments, executed in due form of law," within the letter of the first member of the first section.

The Supreme Court admits that the "negative language" of the section "leaves the law open to the suggestion that the provisions of the act would have applied to such wills if the negative words had not been used." But then that "negative language" will not stand together with the construction which the court would place on the letter of the first section. What has been written is therefore to be stricken out, and what was not imagined by the legislature is to be substituted. In the place of a section negative and restrictive, we are to write one affirmative and remedial. And what is the pretext for this plain exercise of judicial legislation? It is that upon the letter of the section as it now stands, "the cases excepted can on no just principle be distinguished from those left unexcepted." But will the section when recast, as it is proposed, embrace all the cases which are within the principle of the case expressly provided for? The section when reformed would provide for the case of a will made before the passage of the act by a testator dying before the 1st of June 1850; but such will would be out of the act if the testator lived to the 2nd

day of June. "Can any reason be imagined" for this differ-
ence? "If there is any distinction between the two cases, it
would seem the first case had a stronger claim to exemption
from the effect of the new rule."

The language of a statute is its most natural expositor, and
where the language is susceptible of a sensible interpretation,
it is not to be controled by any extraneous considerations.
The construction is to be on the entire statute, and where one
part is susceptible indifferently of two constructions, and the
language of another part is clear and definite, and is consistent
with one of the two constructions of which the former part of
the statute is susceptible, and is opposed to the other con-
struction, then we are to adopt that construction which will
render all clauses of the statute harmonious, rather than that
other construction, which will make one part contradictory to
another. Where the letter of the statute is inconsistent with
itself, we may eviscerate an intent by considering the mischief
existing and the remedy proposed to be introduced. But
what is the mischief to be remedied, and what the remedy,
are to be collected from the statute itself. We are not at
liberty to imagine an intent, and bind the letter of the act to
that intent; much less can we indulge in the license of striking
out and inserting, and remodeling, with the view of making
the letter express an intent which the statute in its native
form does not evidence. Every construction, therefore, is
vicious which requires great changes in the letter of the
statute; and of several constructions that is to be preferred,
which introduces the most general and uniform remedy.
Judged by these principles, we can have no doubt of the
superiority of the construction given by the Court of Appeals
to the act, over that construction which is proposed to be
given to it by the Supreme Court.

The second proposition affirmed by the Supreme Court is,
that the decision of the Court of Appeals giving a construction
to the Maryland act may be disregarded.

In *Nesmith vs. Sheldon*, 7 *Howard*, 817, it had been declared
to be "the established doctrine of this court, that it will adopt

and follow the decisions of the State courts in the construction of their own constitution and statutes, when that construction has been settled by the decision of its highest judicial tribunal."

This declaration was made in a cause involving a question doubtful and important; and a single adjudication of the court of Michigan was accepted as a settlement of the construction of the statute. In *Rowan vs. Runnels*, 5 *Howard*, 134, the court reversed its own opinion expressed in *Groves vs. Slaughter*, 15 *Peters*, 451, in deference to an intervening judgment which had been rendered by the Court of Appeals of Mississippi; and this surrender of its own opinion by the Supreme Court is made the more remarkable from the circumstance, that during the term just closed the court has reasserted the principles of the decision in *Groves vs. Slaughter*, to be well founded in law. Another illustration of the deference with which in past times the decisions of the State courts have been received in the Supreme Court, is given by the case of *Green vs. Neal's Lessee*, 6 *Peters*, 291, where the court reversed its own judgment directly upon the point in construction of a statute of Tennessee, and vindicate this reversal as a sacrifice necessary for the maintenance of its principle. But the case which more fully resembles the present is that of the *United States vs. Morrison*, 4 *Peters*, 124. The late chief justice of the Supreme Court had pronounced judgment in the circuit court for the district of Virginia, on the construction of a statute of Virginia in conformity with the opinions he had frequently expressed in other causes which had come before him in judgment—in fact in conformity with the settled law of the circuit court. Pending the appeal taken from this judgment a case had arisen in the State courts of Virginia, and had been concluded by a judgment of the Court of Appeals of Virginia, giving to the statute a construction directly opposite to that which had been placed on it by the chief justice. This last judgment was deemed conclusive of the subject, and the chief justice, with the grace and propriety which distinguished him through life, and without one word

in defence of his own opinion, pronounced the reversal of his own judgment.

The rule thus enunciated by the Supreme Court was founded partly on the consideration of the inconvenience which would flow from the effort on the part of the courts of the United States to enforce a construction of the statute law of a State different from the construction given to the statute law by the State tribunals, and partly on the provisions of the judiciary act of 1789. The destiny of the courts of the Union it was supposed would be fully accomplished, by securing to the citizen of another State, and to the alien, the same administration of the statute law of a State which is accorded to the citizen of the same State.

According to the former cases, the adoption or rejection of a particular decision of a State court does not depend in any manner on the doctrine of estoppel.

It is not necessary that there should be identity of parties or subject matter, and hence it would seem that if the decision is made with a deliberation and solemnity which evidences a purpose on the part of the court to declare the law, such declaration ought to be accepted by the Supreme Court as an adjudication settling the question so decided. It ought to be presumed that the question was properly presented by the record, or if not necessarily involved in the issue, that it was in the exercise of a proper judicial discretion that the court deemed fit to pass upon it. But the Supreme Court, in the case of *Carroll vs. Carroll*, appear to have unsettled their often enunciated rule. They now declare that they are bound to decide "a question of local law," as they find "it ought to be decided." Hence the correctness of the decision of a local court is a proper subject for inquiry. In making the examination preparatory to this finding, the court follow two rules. The first is the maxim of the common law, *stare decisis*. The second is that rule of deference to the decisions of the local court which we have been so often informed was "the established doctrine" of the Supreme Court. It is now declared that this last rule "has grown up and been held with constant

reference to the other rule, and it is *only so far* and in such cases as this latter rule can operate that the other has any effect." *Stare decisis* is, therefore, in effect, the only rule which the Supreme Court will hereafter acknowledge, and even this only rule is to be applicable under conditions which will serve to render the law more uncertain than if we were informed that the authority of the State courts was to be utterly disregarded. "If the construction put by the court of a State upon one of its own statutes was not a matter in judgment, if it might have been decided either way without affecting any right brought into question, then, according to the principles of the common law, an opinion on such a question is not a decision." "And therefore this court, and other courts organized under the common law, has never held itself bound by any part of an opinion in any case which was not needful to the ascertainment of the right or title in question between the parties." The Supreme Court, therefore, claim the right to inquire, whether the question adjudged was necessarily involved in the issue? and whether, if so involved, the case might not have been determined on some other point? If a case presents a question broadly on its merits and another on the pleadings or form of procedure, and the court decides on the merits, the decision is not to be regarded, if a decision on the point of form would have concluded to a like judgment. The rule prescribed by the Supreme Court is, therefore, more strict than prevails in cases of estoppel. For on the principle of estoppel it is conceded, that a judgment is conclusive on any point fairly in issue, and on which the judgment might have been rendered. As the Supreme Court have not at all times respected their opinions pronounced on the very point in judgment, (*vide* 3 *Howard*, 292, *Ex-parte Christy;* 7 *Howard*, 612, *Peck vs. Jenness,* referred to in the opinion in the case of *Carroll vs. Carroll,*) we are not surprised to learn that *dicta* falling *obiter* from the judges, or even founded in the judgment of the court, do not conclude. In Maryland it is usual to limit the judgment to the question of right involved in the issue. But where a question of general interest is supposed to be involved and is fully discussed and submitted by

counsel, the court frequently decides the question with a view
to settle the law, and it has never been supposed that a deci-
sion made under such circumstances could be deprived of its
authority by showing that it was not called for by the record.
The cases of *Richardson vs. Jones*, 3 *Gill & Johns.*, 163;
*Carter vs. Dennison*, 7 *Gill*, 157, amongst others will estab-
lish this practice. All that is necessary in Maryland to render
the decision of the Court of Appeals authoritative on any point
decided, is to show that there was an application of the judicial
mind to the precise question adjudged; and this we apprehend
is the rule elsewhere. In the case of *Cohens vs. The State of
Virginia*, referred to, the position taken by the late chief
justice is, "that general expressions in every opinion are to be
taken in connection with the case in which these expressions
are used." The same remark is equally true of general ex-
pressions found in any other writing; their precise import is to
be determined by the context. "If they go beyond the case
they may be respected, but ought not to control the judgment
in a subsequent suit where the *very point* is presented. The
reason of this maxim is obvious. The question actually be-
fore the court is investigated with care and is considered in its
full extent." All that is required, therefore, to establish the
authority of any decision is, that the *"very point"* decided was
"actually before" the mind of the court, and was "investigated
with care and considered in its fullest extent." Nothing is
intimated, much less declared, in regard to the supposed ne-
cessity for shewing that the very point so adjudged was insep-
erably involved in the issue. *Dicta* attributed to the court by
a short-hand reporter, especially of ancient date; opinions ex-
pressed by a judge speaking for himself and not as the organ
of the court; general views expressed by the court as illustra-
tive of, but not necessarily leading to, the opinion on the point
intended to be decided, are not to be treated as conclusive,
when similar topics come up directly for judgment. But we
are not aware of the authority which will sustain the position
assumed by the Supreme Court, that the unanimous opinion of
a State court of the highest appellate jurisdiction, directly on a
point which is supposed by the court to be presented by the

62      v.5

record, and which is elaborately discussed by counsel, and is investigated with care and solemnly delivered by the court, can be disregarded as *obiter dictum,* merely because it is since discovered that some other point existed on which the judgment rendered might have been rested. If any such authority exists it has not been referred to.

The canon of judicature which we are informed is hereafter to prevail in the supreme court would seem to have been taken from *Ram on Legal Judgments,* by whom it was borrowed from *Vaughan,* 382. In the course of a long and elaborate argument by the chief justice, it is given as the fifth in a series of seven objections taken by him to the authority of a case reported in *Moore;* the second in the series being, that the case itself bore internal evidence that the opinion, as reported, was no judicial opinion, *nor given in any court.* We are not informed of the response made by the other judges to those rules propounded by the chief justice. But it does appear, that in consequence of an equal division of the court, the judgment was rendered for the defendant, in conformity with the case in *Moore,* the authority of which the chief justice had labored to destroy. Perhaps then we may be allowed to suggest, upon the authority of the chief justice himself, that his entire opinion is no more than a *prolatum,* concluding in no degree to the judgment rendered in the case in which it was expressed. The seventh canon of the chief justice is, that "if a court give judgment judicially, another court is not bound to give like judgment, unless it think that judgment first given was according to law;" and in vindication of the right of individual and independent judgment, he does not hesitate to impeach the accuracy of Lord Coke and to deny the learning of Littleton. But it deserves remark, that the learned chief justice, although ready to contemn the authority of precedents standing in conflict with his own opinions, conceded as his sixth rule, that "an opinion, though erroneous, concluding to the judgment is a judicial opinion, because delivered under the sanction of the judge's oath upon deliberation, which assumes it was, when delivered, the opinion of the deliverer."

But it happens, most unfortunately, that the decision of the

Court of Appeals on the question in controversy was not only called for by the record, but that if the court's opinion on that point had been in favor of the heirs at law, the judgment of the court must have been directly opposite to the judgment which was rendered. In their statement of the case, the Supreme Court overlook the important fact, that the devisees of Mrs. Carroll, representing her interest as the devisee of M. B. Carroll, were made defendants to the bill. It is also overlooked, that the bill prays for an account of the personal and real assets of Michael B. Carroll, and for a declaration that his real estate is liable to the payment of his debts before, and in exoneration of, his negroes, who had been given by his will to his widow as a specific legacy, and had been manumitted by her will to be free after brief terms of service, and it is claimed that the suit is for their protection. It is further averred, that the creditors of Michael B. Carroll are not pressing for a sale of the negroes; that no creditor is in a condition to enforce a sale thereof, and that a decree may be obtained settling all questions of right, and, if proper, for a sale of the real estate before any creditor could obtain execution or other process to enforce a sale of the negroes; and lastly, it is averred that the administrators *de bonis non* of Carroll were about to make a sale of the negroes in furtherance of the interests of the heirs at law; or in other words, to preclude all question in future as between the heirs and the negroes.

All these circumstances form material parts of the case. In the printed statement of the appellants, prepared for the argument in the Court of Appeals, it is insisted, that the equity set up is equally available against the real estate, whether the same be considered as land descended in the hands of the heirs at law of Carroll, or as property devised by his will to his widow. No question was raised by the appellants in regard to the construction or operation of the will. In the statements filed on behalf of the heirs at law and of the devisees of Mrs. Carroll, the question is fully presented. It was elaborately argued by the counsel for those parties, and submitted by them as a question presented by the record and calling for determination. It will also appear by those statements, that whilst

the heirs at law and devisees were united in resisting the claim of the appellants, their opposition was rested on grounds different from, if not indeed inconsistent with and contradictory to, each other. On the part of the heirs at law it was insisted, that the personal estate was the primary fund for the payment of debts, and it was denied that the specific legatee had any equity as against the heirs at law. On the part of the devisees, the chief argument was rested on the original union of the characters of specific legatee and of devisee in the person of Mrs. Carroll; and it was conceded that if the real estate had descended to the heirs at law or had been devised to some other person than Mrs. Carroll, she or her representatives would have been entitled to call for the application of the real assets to the payment of debts for the exoneration of the negroes which had been specifically bequeathed to her. The course of the arguments, therefore, as well as the points raised by the *statements*, *rendered it necessary that the court should* first ascertain who were the proper representatives of the real estate? This question being resolved in favor of Mrs. Carroll, as devisee, the next subject for inquiry was, whether the representatives of her interest, as specific legatee of the negroes, had any available equity against the representatives of her interest, as devisee of the real estate? They decline the discussion of the general question as between a specific legatee, and an heir at law or devisee, "because the question was not before them in the case." They say that the executors of Mrs. Carroll must occupy the same position as she would have done if the bill had been filed by her instead of them, and that the case is not one "of contribution and marshaling of assets between *different* devisees and legatees, because Mrs. Carroll was specific devisee and legatee, and residuary devisee and legatee; she, in fact, with but trifling exception, took under the will the whole estate."

If the court had determined that the real estate had descended to the heirs at law, the two grounds on which they declined a discussion of the general question would have been removed and these two questions would have been directly presented.

1st. Whether a specific legacy or land descended is first applicable in payment of debts?

2nd. Whether the specific legatee of a chattel of peculiar value, as a household slave, has an equity to restrain the executor, who is also the heir at law, from applying that chattel to the payments of debts for the purpose of protecting his inheritance, the creditors being passive and content to take payment out of either fund?

The first is too well settled in England and this country to justify argument thereon. In Maryland, in *Chase vs. Lockerman*, 11 *Gill & Johns.*, 185, it was adjudged that the specific legatee and the specific devisee was bound to contribute ratably to the payment of debts; and it was assumed as a point clear in all the authorities, that land descended was first applicable in payment of debts in relief of personal estate specifically bequeathed. It will not be necessary to remark on the distinction supposed between the specialty and the simple contract creditor. It is averred that Carroll died in debt for the land purchased by him after the date of his will, and, independent of this averment, if the equity could have turned on the supposed distinction, the cause would have been remanded, with liberty to the party to amend.

2nd. It is held by Lord Eldon in *Clarke vs. Ormonde*, *Jacob*, 108, that it was the duty of executors, as far as possible, to preserve articles specifically bequeathed, according to their testator's wish; and unless compelled, they ought not to apply them to the payment of debts. As a corollary, it results, that at the suit of the specific legatee, equity will restrain the executor from voluntarily applying the chattel bequeathed in payment of debts, in a case where the executors are also heirs, and have assets descended, which are first applicable in payment of debts, otherwise the injury to the specific legatee would be incapable of compensation. Hence the importance of the averments in the bill, that the creditors were not pressing and were not in a condition to press, for a sale of the negroes.

Equity is in general reluctant to interfere with creditors in the enforcement of their legal rights. But under certain circumstances it will interpose, as if on a creditor's bill a decree

has been passed for an account of the personal assets, and for a sale of the personal estate, equity may not only restrain the creditor from proceeding at law, but compel him to take satisfaction out of the proceeds of the realty.　And in the case of *Cornish vs. Wilson,* 6 *Gill,* 299, it was held, that a slave manumitted by will, might sue in equity for an account, and for a sale of the real estate, descended or devised, subject to payment of debts, and in the meantime, might restrain the executor in the capricious exercise of his power, or even the execution of the creditor, who would propose to sell the slave for payment of the debts of the testator.　We apprehend that, in principle, this decision would extend to every case of a specific legacy, the subject of which is of peculiar value to the legatee, and the sale whereof would be productive of irreparable loss.　It would seem impossible to deny its application to a case like the one to which we are adverting, where the legacy consists of slaves specifically bequeathed to the widow, with an earnest desire expressed, that they should not be sold for payment of the testator's debts, cherished by the widow during her lifetime, and manumitted by her last will.　To permit the heirs at law who have availed themselves of their proximity in blood to obtain administration on the personal estate of the testator, to sell the negroes into ceaseless bondage in foreign climes, for the purpose of providing for payment of debts which are justly chargeable on the lands descended to the heirs at law, and to do this under the pretence that equity ought not to restrain the remedy of creditors, and where the creditors themselves are passive, would seem to be an act of injustice of which a court composed of slave-holders, residing in a slave-holding State, could not possibly be guilty.　Nor are we willing to believe that the Supreme Court could maintain such a proposition in the face of their own decision, in *Fenwick vs. Chapman,* 9 *Peters,* 461, where it was held in advance of Maryland adjudications, that a slave manumitted might assert his right to freedom, on a petition filed against the executor, by proving that the real estate charged by will with payment of debts, was sufficient for that purpose.　All these cases were earnestly pressed by the counsel for the appellants, and it is not to be presumed

that the court intended, by its silence, to ignore their existence or deny their authority.

We have thus fully examined the decision in *4th Maryland Reports*, 335, for the purpose of showing that the point decided by it was directly presented by the record and by the counsel in argument, and that the judgment pronounced was rendered after the fullest consideration, and, also, to vindicate the correctness of that decision, which, in our opinion, has not been in the slightest degree shaken by anything that has fallen from the Supreme Court.

In conclusion we will observe, that it is manifest to us that the construction which we have heretofore given to the act of 1849 is correct. It was taken from the statute of 7 *William IV.*, and 1 *Victoria, chapter* 26. The 24th section of that act is as follows: "And be it further enacted, that every will shall be construed, with reference to the real estate and personal estate comprised in it, to speak and take effect as if it had been executed immediately before the death of the testator, unless a contrary intention shall appear by the will."

The act was passed on the 3rd of July 1837. That the Parliament which passed it did not understand it as the Supreme Court has interpreted it, is clear from the 35th section, which provides, "that this act *shall not extend* to any will made *before the first day of January, one thousand, eight hundred and thirty-eight.*" Its framers, it appears from this section, understood it to mean what it said, and therefore the necessity to expressly declare to what class of wills it should apply.

Reaffirming the decision in *Magruder and Tuck, vs. Carroll,* we necessarily affirm the order of the circuit court in this cause.

*Order affirmed.*

NOTE BY THE REPORTER.—The importance of the decision in the above case has suggested to the Reporter the propriety of inserting in his reports the decision of the Supreme Court of the United States, in the case of *Carroll vs. Carroll's Lessee.* That decision, together with the one above reported, and the one in 4 *Md. Rep* , 335, will exhibit to the profession all that has been decided by the Supreme Court, and the Court of Appeals, in regard to act of 1849, ch. 229. The opinion of the Supreme Court, in the case of *Carroll vs. Carroll's Lessee,* as delivered by Justice Curtis, is as follows:

"This action of ejectment was brought in the Circuit Court of the United States for the District of Maryland to recover three undivided fourth parts of three tracts of land lying in Prince George's county, in that State. Both parties claimed under Michael B. Carroll, the plaintiffs as heirs at law, the defendant as devisee. It appeared at the trial in the court below, which was had at the November term 1852, that on the 10th day of September 1837, Michael B. Carroll duly executed his last will, the material parts of which are as follows:

"'To my dear wife Jane I give and bequeath all my slaves, and do request that none of them may be sold or disposed of for the payment of my debts, but that provision shall be made for discharging the same out of the other personal property and effects which I shall leave at the time of my death.'

"'All the rest and residue of my property, both real, personal and mixed, I give, devise and bequeath to my said wife Jane, who I do hereby constitute and appoint sole executrix of this my last will and testament, enjoining it upon her, nevertheless, to consult and advise with the said John B. Brooke, as occasion may require, respecting the settlement of estate, and make him a reasonable compensation for the same out of the funds hereinbefore bequeathed to her; and I do hereby revoke and annul all former wills by me heretofore made, declaring this and none other to be my last will and testament.'

"It further appeared that after the execution of this will, Michael B. Carroll acquired other lands, and the plaintiffs, as heirs at law claimed to recover three undivided fourth parts thereof as undevised land. The defendant insisted that these, together with all the other lands of the testator, passed to her under the residuary clause of the will. She admitted that by the common law of Maryland, lands of which the testator was not seized at the time of making his will could not be devised thereby, but insisted that an act passed by the legislature of Maryland, on the 22d day of February 1850, so operated as to cause this will to devise the lands to her. That act is as follows:

"'Section 1. *Be it enacted by the General Assembly of Maryland,* That every last will and testament, executed in due form of law, after the first day of June next, shall be construed with reference to the real estate and personal estate comprised in it, to speak and take effect as if it had been executed on the day of the death of the testator or testatrix, unless a contrary intention shall appear by the will.

"'Sec. 2. *And be it enacted,* That the provisions of this act shall not apply to any will executed before the passage of this act, by any person who may die before the first day of June next, unless in such will the intention of the testator or testatrix shall appear that the real and personal estate which he or she may own at his or her death, should thereby pass.

"'Sec. 3. *And be it enacted,* That this law shall take effect on the first day of June next.'

"It is argued by the counsel for the devisee, that the first section of this act was intended to prescribe a new rule of construction of wills, and to fix the time when the courts should begin to apply that rule ; that new rule being, that wills of the realty should be deemed to speak at the time of the death of the testator; and the time when the courts should begin so to construe them, being the second day of June 1850 ; and that the law should be so read as to mean that after the first day of June 1850, wills should be deemed to speak, as if executed on the day of the testators death, unless a contrary intention should appear.

"To this construction there are insuperable objections. It would change the legal operation, not only of existing wills, but of those which had already taken effect by the death of testators. It would make the same will, if offered in evidence on the second day of June, operative to pass after acquired lands to a devisee, though if offered in evidence on the next preceding day it would be inoperative for that purpose. The object of *the whole law concerning wills, is to enable the owners of* property reasonably to control its disposition at their decease. To cause their real intentions and wishes to be so expressed, and their expression to be so preserved and manifested that they can be ascertained and carried into effect, are the chief purposes of legislation on this subject. So to interpret an act concerning wills as to cause those instruments to operate without regard to the intent of the testator, having one effect to-day and another to-morrow, would not only be arbitrary and a violation of the principles of natural justice, but in conflict with what must be presumed to have been the leading purpose of the legislature in passing the law, the better to give effect to the intent of the testator. To induce the court to believe the legislature intended to make this law retroactive upon a will then in existence, and cause it to pass after acquired lands without any evidence that the testator desired or believed that it would do so, and to fix a particular day, before which the will should not so operate, and on and after which it should so operate, such intention of the legislature must be expressed with irresistable clearness. *Battle vs. Speight*, 9 *Ired.*, 288. It is very far from being so expressed in the first section of this act. On the contrary its natural and obvious meaning is, that wills executed after the first day of June 1850, are the only subjects of its provisions.

"The words "after the first day of June next" refer to and qualify the words "executed in due form of law" which they follow, just as in the same section the words "on the day of the death of the testator" refer to and qualify the word "executed." In the former case they indicate the time when the will shall be deemed to have been executed ; in the latter the period of time when it was actually executed.

"In our opinion the first section of this law is free from ambiguity, and applies only to wills executed after the first day of June 1850; and as this will was executed before that day it is not within this section.

"Nor is it within the second section of the act, because that applies only to cases in which the testator, having executed his will before the passage of the act, might die before the first day of June then next, and this testator survived till after that day.

"It has been supposed however, that although the first section of this act is free from ambiguity standing by itself, and ought to be so construed as to apply only to wills executed after the first day of June 1850, yet that the second section shows that wills executed before that day, were intended to be included in the first section. The argument is that the second section excepts out of the operation of the first section, certain wills executed before the first day of June 1850, and thus proves that the first section embraces wills executed before that day. This argument requires a careful examination. To appreciate it, we must see clearly what are the nature and objects, as well as the form of the two enactments. The first prescribes a new rule of construction of wills. They are to be deemed to speak as of the time of the death of the testator; but power is reserved to him to set aside this rule by manifesting in his will an intention not to have it applied. The real substance and effect of the second section is to enable certain testators to pass their after acquired lands by expressing an intention to pass them.

"By force of the first section, the law prescribes a rule of construction which a testator may set aside. By force of the second section a testator may manifest an intention to have his will speak as of the time of his decease, and so adopt that rule of construction. It thus appears that the office of the second section is not to take certain cases out of the operation of the first section, but to prescribe another and substantially different rule of law for those cases. It is true, negative language is used, which leaves the law open to the suggestion that the provision of the act would have applied to such wills if the negative words had not been used.

"But it must be remembered that this is only an inference, the strength of which must depend upon the subject matter of the provisions and the language employed in making them.

"If every part of the law can have its natural meaning and appropriate effect by construing this second section as an additional enactment, and if to construe it as an exception would affix to the first section a meaning which would be inconsistent with the great and leading purpose of the legislature, and at the same time be arbitrary and unjust; and if when viewed as an exception the cases excepted can, on no just principle, be distinguished from those left unexcepted, then manifestly it

should not be construed as an exception, but as a substantive enactment, prescribing for the particular cases a new rule of law, not provided for in the first section. We have already pointed out the consequence of holding the first section applicable to all wills. In addition to this it is worth while to enquire, if the second section was designed to except certain cases out of the first section, what those cases were, and how they are so distinguished from the cases left unexcepted as to be proper subjects of exception? The proposition is, that the first section includes all wills whenever executed, and the second excepts only wills executed before the passage of the act by persons dying after the passage of the act, and before the first day of June 1850. Can any reason be imagined why a will executed before the passage of the act should be within the first section, if the testator died the day before the passage of the act, and out of it, he died the day after its passage? If there is any distinction between the two cases it would seem the first case had the stronger claim to exemption from the effect of the new rule.

"Nor do we perceive any difficulty in so construing the two sections as to allow to each its appropriate effect, while neither of them violates any principle of natural right; the effect of the first section being to prescribe a new rule of interpretation for wills executed after the first of June, and the effect of the second being to enable testators who had executed their wills before the passage of the act and who might die before the first day of June, to pass after acquired lands if they manifested an intention so to do. Cases of testators who should execute wills after the passage of the act and before the first day of June, or who should die after that day, having previous to that day executed their wills, are left unprovided for, either because it was thought that they would have sufficient time to conform their wills to this change of the law, or because their cases escaped the attention of the legislature as happened in *Barnitz's Lessee vs. Casey*, 7 *Cranch*, 468, and *Brewer's Lessee vs. Blougher*, 14 *Pet.*, 199.

"We have been referred to two decisions in the Supreme Court of Massachusetts in which a retroactive effect was allowed to a statute of that State upon existing wills. They are *Cushing vs. Aylwin*, 12 *Met.*, 169. *Pray vs. Waterston*, 12 *Met.*, 262. But an examination of those cases will show that the interpretation put by that court on that statute, was attended with none of the difficulties which beset the construction of the statute of Maryland contended for by the counsel for the devisee. The law of Massachusetts did not enact a new rule of construction. It simply enabled testators to devise after acquired lands by plainly and manifestly declaring an intention to do so. The law could only operate in furtherance of the intention of the testator, and could never defeat that intent by applying to wills an arbitrary rule of construction.

"This distinction was pointed out by this court in *Smith, et al., vs. Edrington,* 8 *Cranch,* 66, in reference to a similar statute in Virginia, respecting which Mr. Justice Washington said: "The law created no new or different rule of construction, but merely gave a power to the testator to devise lands which he might possess or be entitled to at the time of his death, if it should be his pleasure to do so." Moreover the language of the act of Massachusetts was broad and general enough to include in its terms all wills which should take effect after the law went into operation. There was therefore nothing in the words, or the subject matter of the act, to lead the court to a more restricted construction. Still that court thought the retroactive effect, of even such a law, required some notice, and they vindicate the departure from an important principle in that case with some effort; and the reluctance with which it should be departed from is well expressed by the Supreme Court of North Carolina, in *Battle vs. Speight,* 9 *Iredell,* 288, in construing a similar statute of that State.

"We have also been referred to a manuscript opinion of the Court of Appeals of the State of Maryland upon the effect of this will. It appears that in November last the executors of Mrs. Carroll, the devisee, who is deceased, filed their bill in the circuit court of Prince George's county, praying that the administrators *de bonis non* of Michael B. Carroll might be enjoined from making sale of his negro slaves. The heirs at law and the administrators *de bonis non* of Michael B. Carroll were made parties. The circuit court refused the injunction, the complainants appealed: the Court of Appeals affirmed the decree of the circuit court and dismissed the bill. The grounds upon which the court rested its decree will best appear from the following extracts from the opinion:

"'The bill is filed by the executors of Mrs. Carroll against the administrators *de bonis non* of Mr. Carroll and his heirs at law. The gravamen of it is, that he specifically bequeathed his negroes to his wife, and desired they should not be sold, and that his debts should be paid out of his other estate; that she manumitted them, and that there is other personal and real estate enough to pay the debts due by his estate. Injunction is asked to prevent the sale of the negroes under an order of the orphans court of Prince Georges county, which, it is alleged, is about to be done. It is also claimed in the bill, that at the time of the will of Mrs. Carroll she must be considered as holding the negroes as legatee, and not as executrix, the time specified by law for winding up the estate of her husband having elapsed.

"'This last ground cannot avail. There is no allegation in the bill that a *final* account had been settled by her, and the bill shows that a large amount of debts remained unpaid, and that the creditors of the estate of her husband had commenced proceedings to secure their payment, which proceedings are still pending. In this claim of the bill we suppose but little

confidence was, or is, reposed by those who framed it; at all events, there is nothing in it. There is nothing in the facts of the case to justify the presumption that there had been a final settlement of the estate of Michael B. Carroll and all his debts paid off; the truth is, the bill directly contradicts the facts out of which such a presumption could arise.

" 'It is contended, on the part of the complainants, that the real estate and personal property, other than the negroes of Michael B. Carroll, ought to be applied to the payment of his debts before the negroes are resorted to. This may or not be so; and in regard to it we pass no opinion, because the question is not before us in this case. *This is not a bill filed on behalf of the negroes,* but by the executors of Mrs. Carroll, and they must occupy the same position in regard to the creditors of Michael B. Carroll, who are represented by the administrators *de bonis non,* as she would have done had the bill been filed by her instead of by them. And if she were the party complainant, how would the case stand? Why thus: Michael B. Carroll died in debt, leaving a will by which his real and personal estate is specifically devised and bequeathed to his wife. His *creditors* would have the right to proceed against his entire estate for payment; first, however, against the personal as the primary fund. *Their* rights could not be affected by anything he might request in his will; their claims would attach to his entire estate. *He did not manumit his slaves;* and, moreover, this is not the case of contribution and marshaling of assets between *different* devisees and legatees, because here Mrs. Carroll was specific devisee and legatee, and residuary devisee and legatee; she, in fact, with but trifling exception, took under the will the whole estate. Had she, immediately on obtaining letters of administration, manumitted the negroes, it could not be pretended such manumission could have affected the rights of the creditors of her testator; and it must be obvious, if she could not do it by her act as executrix, that she could not accomplish it by her will.

" 'For these reasons we affirm the order of the circuit court refusing the injunction.' "

"It is apparent that the question whether some of the lands of the testator were undevised could not enter into or affect the decision of this case. The negroes not being parties, no question could arise whether they were entitled to have the debts paid out of the land of the testator, and the court declares the question is not before.them. As between Mrs. Carroll, the executrix of her husband's will, or her representatives and the creditors of her husband, the right of the latter was complete to resort to the personal property, including the negroes, and it was therefore wholly immaterial who owned the land. The only prayer in the bill was, that the creditors, through the administrators, might be restrained from making their debts out of the negroes. The only question in the case was whether

they could be so restrained. And when it was decided that their legal right was to have all the personalty, including the negroes, applied to their debts, it was immaterial what other rights they or others might have.

"We do not consider, therefore, that a comparison of the titles of the heirs at law and the devisee of Michael B. Carroll to his lands was brought into judgment by this injunction bill.

"If the Court of Appeals had found it necessary to construe a statute of that State in order to decide upon the rights of parties subject to its judicial control, such a decision, deliberately made, might have been taken by this court as a basis on which to rest our judgment. But it must be remembered that we are bound to decide a question of local law, upon which the rights of parties depend, as well as every other question, as we find it ought to be decided. In making the examination preparatory to this finding, this court has followed two rules, one of which belongs to the common law, and the other is a part of our peculiar judicial system. The first is the maxim of the common law, *stare decisis.* The second grows out of the 34th section of the judiciary act, (1 *Stat. at Large*, 92,) which makes the laws of the several States the rules of decision in trials at the common law; and inasmuch as the States have committed to their respective judiciaries the power to construe and fix the meaning of the statutes passed by their legislatures, this court has taken such constructions as part of the law of the State, and has administered the law as thus construed. But this rule has grown up and been held with constant reference to the other rule, *stare decisis;* and it is only so far and in such cases as this latter rule can operate that the other has any effect.

"If the construction put by the court of a State upon one of its statutes was not a matter in judgment, if it might have been decided either way without affecting any right brought into question, then, according to the principles of the common law, an opinion on such a question is not a decision. To make it so, there must have been an application of the judicial mind to the precise question necessary to be *determined to fix the rights* of the parties and decide to whom the property in contestation belongs.

"And therefore this court, and other courts organized under the common law, has never held itself bound by any part of an opinion, in any case, which was not needful to the ascertainment of the right or title in question between the parties. In *Cohens vs. The State of Virginia*, 6 *Wheat.*, 399, this court was much pressed with some portion of its opinion in the case of *Marbury vs. Madison.* And Mr. Chief Justice Marshall said: "It is a maxim not to be disregarded, that general expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case they may be respected, but ought not to control the judg-

ment in a subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated." The cases of *Ex-parte Christy*, 3 *How.*, 292, and *Peck*, *et al.*, *vs. Jenness*, *et al.*, 7 *How.*, 612, are an illustration of the rule, that any opinion given here or elsewhere, cannot be relied on as a binding authority, unless the case called for its expression. Its weight of reason must depend on what it contains.

"With these views we cannot regard the opinion of the Court of Appeals as an authority on which we have a right to rest our judgment. We have already stated the reasons which have brought us to a different construction of the statute; reasons which do not seem to us to be shaken by the opinion of the Court of Appeals.

"Our conclusion is that the will of Michael B. Carroll was not within the statute, and the lands in question were consequently undevised.

"One other exception was taken at the trial, respecting which it is only necessary to say that we think the identity of name of the two tracts of land in the same county, taken in connection with the long possession of those under whom the plaintiffs claimed, and the absence of all evidence of any adverse claim or outstanding title was sufficient to warrant the jury in finding that the land was embraced in the patents from the State.

"We are also of opinion that the judgment is correct in form, being for the term which the declaration alleges was created by the plaintiffs as owners of three undivided fourth parts of the land.

"The judgment of the circuit court is affirmed, with costs."