784 A.2d 1112

**Michelle M. SCHMIDT**

**v.**

**PRINCE GEORGE'S HOSPITAL.**

**No. 119, Sept. Term, 2000.**

Court of Appeals of Maryland.

Nov. 15, 2001.

Reconsideration Denied Dec. 3, 2001.

Edward John Skeens, Oxon Hill, for petitioner.

Herbert A. Thaler, Jr., Baltimore (Harry K. Wolpoff, Ronald S. Canter of Wolpoff & Abramson, L.L.P., Rockville, all on brief), for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, Judge.

On 1 May 2000, judgment was entered by the District Court of Maryland, sitting in St. Mary's County, in favor of Prince George's Hospital (Respondent) in a suit brought by it against Michelle M. Schmidt (Petitioner) to recover $1756.24 for medical services provided by it to her in 1997 when she was 16 years of age. Petitioner was an adult when the suit was filed in 1999. Petitioner appealed to the Circuit Court for St. Mary's County. She contended that she could not have been sued while a minor, as there was, in her view, no Maryland statute or common law holding that a minor child is liable for medical necessaries, and therefore she could not be sued as an adult for the medical services rendered when she was a minor.

Respondent countered that a minor may be held liable for necessary emergency medical treatment under the doctrine of necessaries and that such liability was not extinguished merely upon reaching adulthood. On 6 November 2000, the Circuit Court entered a judgment in the appeal [1] in favor of Respondent in the amount of $1756.24, plus interest and costs. Respondent recovered the amount of the judgment from Petitioner through wage attachments.

We granted Petitioner's *writ of certiorari* on 9 January 2001.[2]

The questions presented in the successful petition, modified only stylistically, are:

1. Whether, under Maryland law, a minor under a legal disability is personally liable for medical necessaries rendered upon her person; and therefore, suable as an adult under an implied contractual promise to pay the medical provider?

2. May a 16 year old make a binding promise to pay at age 18?

We shall affirm.

## I.

The material facts of this case do not appear to be in dispute. On 7 March 1997, Petitioner, then 16–years–old,[3] was involved in a two-vehicle collision. At the time, she was driving a 1997 Ford Escort owned by Lewis Arno Schmidt, Sr., her grandfather, and was insured with personal injury

---

1. As the amount in controversy was less than $2500, Maryland Code (1998 Repl. Vol.), Courts and Judicial Proceedings Art., § 12–401(f) and Maryland Rule 7–102(a)(1) provide for such appeals to proceed *de novo*.

2. *Schmidt v. Prince George's Hospital*, 362 Md. 359, 765 A.2d 142 (2001).

3. Petitioner's date of birth was listed on Respondent's bill for the medical services as 22 December 1980, a fact she did not dispute.

protection (PIP) benefits through her father's insurance company, Erie Insurance Group.[4] Petitioner was transported to the Shock Trauma Unit at Prince George's Hospital (Respondent), where she was initially admitted as "Jane Doe," without an emergency contact person or telephone number, because she was unconscious at the time of arrival. Although Respondent later was able to identify Petitioner's name and address, it was only able to determine that her father was "Mr. Schmidt" and a telephone number for him. Due to the severity of Petitioner's injuries sustained in the collision, Respondent provided necessary emergency medical care for a brain concussion and an open scalp wound. As of her discharge on 8 March 1997, Petitioner had incurred hospital expenses in the amount of $1756.24.

Soon after her release from the hospital, Petitioner filed for benefits under the coverage provided in her father's Erie policy. During the claim process, Petitioner and her father provided several documents to Erie regarding her medical expenses. On 16 March 1997, Petitioner and her father signed a Disclosure Authorization, authorizing Petitioner's treating physician to furnish Erie with the records of her post-accident treatment. On 1 May 1997, Petitioner and her father signed an Assignment and Authorization of benefits under the PIP coverage instructing and directing Erie to pay directly to her treating physician the amount owed him. Thereafter, a

---

**4.** In oral argument before the Circuit Court and this Court, Petitioner's counsel indicated that the Erie policy was held by the grandfather, Lewis A. Schmidt, Sr. In her brief to this Court, however, Petitioner asserts that "the father received this exact amount [the amount owed to Respondent] from his insurance carrier, the Erie Insurance Group, by check dated April 29, 1997." *See* Petitioner's Brief at 8. Several exhibits put into evidence indeed indicate that the Erie policy was held by Petitioner's father, Lewis A. Schmidt, Jr. On the Disclosure Authorization filed by Petitioner with Respondent, Lewis A. Schmidt, Jr., is listed as the named insured on the Erie policy. Additionally, on the Assignment and Authorization form Petitioner filed with Erie, Petitioner's father is again listed as the policy holder (with Petitioner herself listed as the claimant). Finally, in a letter dated 22 March 2000 from Erie to Petitioner's counsel, an Erie Claims Supervisor indicated that Petitioner's father held the policy with Erie and that he was sent the 29 April 1997 PIP proceeds check.

check in the amount of $1756.24 also was issued by Erie to "Lewis A. Schmidt for Minor, Michelle Schmidt" in reference to "Prince George's Hospital Center, Service Date 03–07–1997 to 03–08–1997." The check was negotiated, but the funds were not used by Petitioner or her father to pay Respondent; rather, the funds apparently were used to purchase a replacement automobile for Petitioner.

Following an unsuccessful demand for payment made to Petitioner, Respondent filed suit in the District Court, in Petitioner's county of residence, on 19 November 1999, after she attained her majority. Petitioner filed a Notice of Intention to Defend, explaining that she denied liability and that the debt was the responsibility of Prudential Health Care Plan, Inc.[5] Petitioner thereafter filed a motion for summary judgment or to dismiss based on her age at the time the medical services were provided. The motion was denied. Neither Petitioner nor her counsel appeared for trial. The District Court granted judgment upon affidavit to Respondent in the amount due for Petitioner's hospital treatment. Petitioner's appeal to the Circuit Court resulted effectively in affirmance of the District Court's judgment. The Circuit Court explained its ruling, in pertinent part:

> The question is, at the time [Petitioner] was 16 plus when she had this accident, and she was placed in the hospital for care. I think the evidence is undisputed that the care was necessary for her well-being, could possibly have affected her living as a result of it. . . . So the Court finds that the evidence that is uncontradicted, that she went to the hospital and the amount being sued for is for services rendered. There is no suggestion that the services weren't reasonable and fair, under the circumstances. The question is . . . that even though it was for her necessity, she has a disability and therefore cannot be held liable either then or after

---

5. Although Petitioner casually hints in her brief at Prudential Health Care Plan, Inc.'s liability, she directed us to no evidence in the record supporting Prudential's connection to this case, other than her claim that Prudential was her father's HMO at the time of her hospitalization.

attaining the age of majority. She attained the age of majority when she became 18. She was sued by [Respondent] for that debt.... People who deal with minors deal with them at their peril. But when a person goes to a hospital for medical treatment that is possibly life saving, no one would—I can't think of any higher form of necessity for a person, and in this case [Petitioner], for those services. Now, those services being a necessity, the parents and/or child can be held responsible for. And if a child goes out and has to—it goes to the hospital, and at the time it is a minor a parent could be held responsible for that. Parents are responsible for the necessities of their children....

In this case the hospital rendered services to [Petitioner], and that debt has not been paid. [Petitioner] has become an adult, and [Respondent] has sued her as such, and the Court finds that those pleadings suing her individually, not through a custodian or *ad litem,* was perfectly appropriate. Now [Petitioner] has the right to revert back, in evidence, that at the time this debt was incurred, as to her minority, which it is undisputed she was a minor, none-the-less the Court finds the law has been well settled for a long time and has not changed, that minors are responsible for necessities. Of course, it imputes that responsibility to parents, but in this case she herself is responsible for that because it is a necessity. There is no requirement that [Respondent] has to sue at this time, within the Statute of Limitations, sues her as an adult. She is, as an adult, can use the minority right she had, but the [C]ourt does not find that she has a right to decline to pay a debt to a hospital under those circumstances, just because she didn't execute any agreement. There certainly is an implied contract that she should pay for medical services for her benefit, no one else's, and the law is well settled that the liability arises from an implied promise to pay.... [I]f the emergency room had turned her down and she had died or suffered serious injury because nobody was going to be responsible for paying it, then they would sue the hospital for malprac-

tice.... [H]er disability at that time is not an excuse nor a defense for her obligations to the hospital.

We granted *certiorari.* Petitioner asserts that a 16–year–old child is not legally capable of making an implied contract to pay for emergency medical treatment rendered for her benefit, and that the doctrine of necessaries does not permit a hospital to sue a minor child and obtain a money judgment without naming the parent as the primary, legally responsible person. Not having done so, Respondent may not sue Petitioner, upon her reaching adulthood, for the cost of the medical treatment provided to her when a minor. Respondent naturally counters that the District Court and the Circuit Court correctly entered judgment in its favor for the value of the emergency treatment rendered to Petitioner and correctly upheld Respondent's claim initiated solely against Petitioner after the disability period defined by her age had ended.

## II.

### A.

█ In the absence of a statute to the contrary, the prevailing modern rule is that a minor's contracts are voidable;[6] nevertheless, it also is well established that a minor may be liable for the value of necessaries furnished to him or her. This doctrine, eponymously referred to as the doctrine of necessaries, is well recognized in Maryland law. In *Monumental Building Association v. Herman,* 33 Md. 128, 1870 WL 3168 (1870), our venerable predecessors explained somewhat the breadth and application of this doctrine.

By the common law, persons, under the age of twenty-one years,[7] are not bound by their contracts, *except for necessaries,* nor can they do any act, to the injury of their

---

6. See Part III.C for our discussion of Petitioner's assertion that contracts entered into by minors are void *ab initio,* as opposed to voidable.

7. Effective 1 July 1973, the age of majority in Maryland was reduced from 21 to 18 years of age. Maryland Code (1957, 1998 Repl. Vol.), Art. I § 24.

property, which they may not avoid, when arrived at full age. Their responsibility for crime or fraudulent dealing, depends more on their discretion and power to discriminate right from wrong, what is just or otherwise, than on their age. Infants have this indulgence from their supposed want of judgment in their transactions with others, and the law takes this care of them to prevent them from being imposed upon, or overreached by persons of more years and experience.

They are allowed to contract for their benefit with power in most cases, to recede from their contract when it may prove prejudicial to them, *but in their contract for necessaries, such as board, apparel, medical aid, teaching and instruction, and other necessaries, they are absolutely bound, and may be sued and charged in execution;* but it must appear that the things were absolutely necessary, and suitable to their circumstances, and whoever trusts them does so at his peril, or as it is said, deals with them at arms' length.

Their power, thus to contract for necessaries, is for their benefit, because the procurement of these things is essential to their existence, and if they were not permitted so to bind themselves they might suffer.

*Monumental,* 33 Md. at 131–32 (emphasis added).

Approximately 123 years later, in *Garay v. Overholtzer,* 332 Md. 339, 631 A.2d 429 (1993), the Court held that, although a parent is liable at common law and by statute for the medical expenses incurred on one's child's behalf, the child, when contractually liable for those medical expenses because the parent is unable or unwilling to pay, may attempt to recover those expenses from the tortfeasor who inflicted the injuries necessitating the medical treatment. *Garay,* 332 Md. at 374, 631 A.2d at 444. The analysis in *Garay* began by noting that "a minor can very well be responsible for pre-majority medical expenses not only through emancipation, pre-payment, or through the death or incompetency, but also under the doctrine of necessaries." *Garay,* 332 Md. at 367, 631 A.2d at 443. We acknowledged that "the application of the necessaries

doctrine is often limited ~~to~~ when the minor child is living with and supported by his parents" because parents are responsible at common law and by statute for the necessaries of their children. *Garay,* 332 Md. at 368–69, 631 A.2d at 444; *see* Family Law Art. § 5–203(b)(1) (stating that the parents of a minor child "are jointly and severally responsible for the child's support, care, nurture, welfare, and education"). We noted, however, that "where the parent refuses or is unable to furnish necessaries, the infant is liable for necessaries furnished him or her." *Garay,* 332 Md. at 369, 631 A.2d at 444. After considering the various manifestations and applications of this rule in certain other jurisdictions, we resolved that,

> [a]lthough we decline to vest a right to recover medical expenses in a minor in *all* cases, *we agree that the doctrine of necessaries is sufficient to hold a minor child liable for medical expenses incurred by him or her if it can be shown that his or her parent is unwilling or truly unable to pay them.* This liability will, in turn, give a minor the right to claim medical expenses on his or her own behalf. It would be manifestly unjust to hold a child liable for medical expenses but to deny that child the opportunity to recover those expenses from a wrongdoer.

*Garay,* 332 Md. at 371, 631 A.2d at 445 (emphasis added). We concluded:

> it would be patently unfair to disallow a claim by a minor child for medical expenses, but to then subject that minor child's recovery to the hospital lien. Under such a circumstance, the minor must be allowed to recover medical expenses *to the extent that the minor will be liable for such expenses.*

*Id.,* 332 Md. at 373, 631 A.2d at 445 (emphasis added). The Court, however, did not need to refine what was encompassed by the term "unwilling to pay" or explore the factual contexts in other jurisdictions when the alternative of a parent's unwillingness to pay for a child's necessaries triggered (or did not trigger) the child's liability.

Most recently, in *Johns Hopkins Hospital v. Pepper*, 346 Md. 679, 697 A.2d 1358 (1997), we considered, among other issues, whether a minor may recover medical expenses incurred to treat his injuries from claimed medical malpractice where his parents were unable to pay for those expenses and where their claims against the third-party tortfeasor were barred by the statute of limitations. Reiterating that "[t]he doctrine of necessaries has long been a feature of Maryland law," we noted that both parties agreed that *Garay* was the controlling law in that case. *Pepper*, 346 Md. at 692, 697 A.2d at 1365 (citing *Monumental*, 33 Md. 128). In applying the doctrine, as explicated in *Garay*, to *Pepper*, we determined that the doctrine

> is merely an acknowledgment that for certain services, *a minor should not be heard to disavow a contract which by personal necessity required his or her participation.* In a case of catastrophic medical injury, we can certainly conceive of a situation where the parents can afford some but not all of the injured child's past, present, and future medical expenses. Assuming limitations has barred parental claims for such, the doctrine of necessaries protects an injured minor's right to recover from a tortfeasor medical expenses that his or her parents are ill-able to afford *and for which he or she ultimately may be liable.* ... We cannot countenance a result that would leave the only innocent victim in such a transaction uncompensated for his or her injuries and potentially beholden to the compelled generosity of the taxpayer. Public policy and justice demand that an injured minor's right to recover medical expenses in his or her own name after limitations has barred parental claims begin where the parents' financial ability to provide for medical necessaries ends.

*Pepper*, 346 Md. at 694–95, 697 A.2d at 1365–66 (emphasis added). The facts of *Pepper* did not require the Court to examine the unwillingness axiom of the necessaries doctrine.

█ The rationales underlying *Garay* and *Pepper* recognize that public policy and justice demand that an injured minor have the right to recover incurred medical expenses from a

third-party tortfeasor, where the child's parents are unable or unwilling to pay for those expenses, *because the medical provider may sue to recover them,* either during the child's minority or within the statute of limitations after the child has reached the age of majority. By parity of reasoning, it would seem that such a child, upon attaining adulthood, may be liable in contract to pay for medical necessaries provided to him or her while a minor, if the parents were unable or unwilling to pay for such necessaries. Before we may reach such a holding, however, it seems prudent to examine how, if at all, our sister states regard the unwillingness prong of this aspect of the doctrine of necessaries.

## B.

There appears to be no case elsewhere that supplies a user-friendly, all-purpose definition or scope of the term "unwilling to pay" in connection with the doctrine of necessaries. The vast majority of these cases share two common traits: they are bereft of detailed or substantive analysis of the "unwillingness" standard, and the varying outcomes are largely fact-driven. Based on its survey of the foreign cases, the Dissent urges limiting our application of "unwilling" only to cases in which: 1) the parent has abandoned the child; 2) the parent contributes absolutely nothing to the child's support; or 3) the child has recovered medical expenses from a tortfeasor and the parent refuses to pay for the care. Dissent, at 543–544. These categories of "unwillingness," although not entirely inaccurate[8], are too limiting.

---

8. With regard to its first category, parental abandonment, the Dissent cites for support *In re Dzwonkiewicz's Estate,* 231 Mich. 165, 203 N.W. 671 (1925). The Dissent (at 564) reads this case to have turned on the father's abandonment. Although the Michigan court mentioned the father's abandonment, that was only a factual predicate to set the stage for the real issue addressed by the court, whether the medical provider could recover by petition in the probate court against the appointed guardian (the child's mother) of the child's estate. *Id.* at 671. The estate of the child, who survived the automobile accident that caused his injuries which necessitated the physician's care, was funded by the proceeds of the settlement of a tort suit brought by his mother, as next

Regarding the Dissent's second category, for example, a distinction has been recognized in at least one jurisdiction between a parent who always refuses to pay his child's bills and refuses to provide any support to the child, and a parent who generally supports his child, but currently is refusing to pay only one bill. *See North Carolina Baptist Hospitals v. Franklin*, 103 N.C.App. 446, 405 S.E.2d 814 (1991) (holding a child is not liable when her parents did everything they could in regard to necessaries except pay a bill). In the latter case category, the parent does not qualify as "unwilling" and the child is not held liable. The theory underlying this distinction is that to allow differently would give some parents little or no incentive to pay for their children's expenses. For the reasons explained *infra*, we are not persuaded to adopt this distinction.

As to the Dissent's third category, to be sure there are cases holding a child liable for his or her necessaries where

---

friend, against the tortfeasor. *Id.* The physician's recovery against the estate was allowed, despite the fact that his claim was based on an implied contract with the child and not with the guardian-parent. *Id.* at 672. Therefore, this case does not really buttress the Dissent's first category of "unwillingness" situations.

The Dissent cites two cases to support its second definition of "unwilling" (i.e. when a parent contributes nothing towards the child's support). The interpretation of those cases by the Dissent, however, takes them a bit out of context. In *Trainer v. Trumbull*, 141 Mass. 527, 6 N.E. 761 (1886), the issue before the court was whether the items provided to the child were "necessaries." The facts of the case, however, do not turn on whether the child's parent "did anything toward[ ] his care or support." *Trainer*, 6 N.E. at 762. In *Strong v. Foote*, 42 Conn. 203, 1875 WL 1886 (1875), the case did not hinge on the fact, as the Dissent suggests, that the "child's guardian did not show any effort or intention to repair or preserve the child's teeth," Dissent, at 565 (citing *Strong*, 42 Conn. at 205), rather it turned on whether the dentist should have "instituted an inquiry as to a guardianship over the defendant ... as a pre-requisite for a recovery in this suit...." *Strong*, 42 Conn. at 205. Because the dentist had done work on the child in the past and the child's guardian had paid for that work, the court found the dentist acted reasonably in providing the instant necessary service to the child and held the child liable for the cost. *Id.* Although the guardian did refuse payment, we do not read the court's analysis as turning on that fact.

the child had recovered damages from the tortfeasor.[9] The rationale in those cases seems to be that it is not unfair to require a child to pay for his or her necessaries where he or she received money as damages because he or she will not be put in any worse position then prior to the tort. *See Cole v. Wagner,* 197 N.C. 692, 150 S.E. 339, 341 (1929) ("To allow the defendant infant to recover upon this theory and then deny the plaintiff in the present action the right to recover on the same theory of necessary expenses, would be blowing hot and cold in the same breath."). Similarly, there are courts that seem to conclude that a child should not be required to pay for his or her necessaries where he or she has *not* recovered damages from a tortfeasor.[10]

Some states appear to hold that, in order to find a parent "unwilling," thus making a child liable for his or her necessaries, a court should require hard and fast proof of default by the parents. Those states note that in order to meet the requirement of "unwilling," it must be shown that a parent was billed and/or sued and still refused to pay.[11] We shall not

---

9. *See Bitting v. Goss,* 203 N.C. 424, 166 S.E. 302 (1932) (placing liability on a child for medical expenses when his father refused to pay and the child recovered damages for his injuries); *Cole v. Wagner,* 197 N.C. 692, 150 S.E. 339 (1929) (finding a child liable for his medical expenses after he recovered damages and his father was unable or unwilling to pay); *Gardner v. Flowers,* 529 S.W.2d 708 (Tenn.1975) (holding a child, who recovered damages, liable for medical expenses which her parents were unable to pay).

10. *See, e.g., Poole v. Wilkinson,* 42 Ga. 539 (Ga.1871); *Westrate v. Schipper,* 284 Mich. 383, 279 N.W. 870 (1938); *North Carolina Baptist Hospitals, Inc. v. Franklin,* 103 N.C.App. 446, 405 S.E.2d 814 (1991); *Siegel v. Hodges,* 15 A.D.2d 571, 222 N.Y.S.2d 989 (2 Dept.1961); *Stetson v. Russell,* 130 Misc. 713, 225 N.Y.S. 139 (App.Term1927); *Madison Gen. Hosp. v. Haack,* 124 Wis.2d 398, 369 N.W.2d 663 (1985).

11. *See, e.g., Stetson v. Russell,* 130 Misc. 713, 225 N.Y.S. 139 (App. Term1927) ("[The father] was never served in this action. . . . In order to fasten any liability on [the child] . . . it was absolutely necessary for the plaintiff to prove, . . . that he was unwilling to furnish such services, or would not pay for them."); *Madison Gen. Hosp. v. Haack,* 124 Wis.2d 398, 369 N.W.2d 663, 667 (1985) ("[T]he record in this case is insufficient to establish the parents' neglect, failure, refusal, or inability to pay. There is no evidence that the hospital ever sought payment from [the mother].").

subscribe to that requirement as an essential prerequisite to a finding of unwillingness.

There are a significant number of states that interpret their version of the doctrine of necessaries as placing liability on a child *only* when his or her parents are financially unable to pay.[12] These cases involve similar factual situations and comparable analyses to the other cases discussed *infra*, except for the omission of the "unwilling" prong.

The categories suggested in the Dissent should not be exclusive. While Judge Raker states that "unless a case falls into one of the three categories of cases ..., I would not hold the child responsible for the parents' choices," Dissent, at 572–573, we believe that there may be other circumstances that qualify a parent as "unwilling," even in a singular instance of unwillingness such as is presented in the present case.

To the non-exhaustive list fashioned by the Dissent, we add the factual context of the present case, as explicated in Part III(D) of this opinion. We do this mindful of the distinction made by some states that a singular episode of a parent's refusal to pay for a child's necessaries might not satisfy that state's view of adequate evidence of "unwillingness" so as to trigger the minor's liability. Overweighing the arguable unfairness to the minor in the balancing, at least in the present case, is the consideration of not placing hospitals and other emergency health care providers in a situation where apparently financially-able individuals may avoid paying for necessary medical treatment through a contrivance similar to that demonstrated on the record of this case.

---

12. *See Poole v. Wilkinson*, 42 Ga. 539, 540, 1871 WL 2454 (Ga.1871) ("Perhaps if the guardian were insolvent, and it could be proven that the services were necessary to the ward ..., equity might grant relief, and cause the debt to be paid out of the ward's property."); *Siegel v. Hodges*, 15 A.D.2d 571, 572, 222 N.Y.S.2d 989 (2 Dept.1961) ("[T]he infant may be held liable for necessaries furnished to him if his parents ... are unable to pay for them.") (citations omitted); *Greenville Hosp. Sys. v. Smith*, 269 S.C. 653, 239 S.E.2d 657, 658 (1977) ("[T]he minor is not liable unless the parents are unable to pay the reasonable value of the hospital services....").

## III.

Petitioner next asks us to repudiate the common law doctrine of necessaries in its entirety and to hold that "this principle should never be accepted as valid Maryland law." According to Petitioner, the doctrine of necessaries creates a "patently unfair scenario" and provides Maryland judges with the opportunity to "ignore the existing Maryland law," specifically, Maryland Rule 1–202(*l*), which includes "an individual under the age of 18 years" in its definition of an "Individual under disability."

### A.

██ We acknowledge that this Court is not precluded from altering a common law rule in situations where, "in light of changed conditions or increased knowledge, . . . the rule has become unsound in the circumstances of modern life, a vestige of the past, no longer suitable to our people." *State v. Sowell,* 353 Md. 713, 723, 728 A.2d 712, 717 (1999) (quoting *State v. Wiegmann,* 350 Md. 585, 604, 714 A.2d 841, 850 (1998) (quoting *Harrison v. Montgomery County Board of Education,* 295 Md. 442, 459, 456 A.2d 894, 903 (1983))) (citing *Gaver v. Harrant,* 316 Md. 17, 28, 557 A.2d 210, 216 (1989); *State v. Minster,* 302 Md. 240, 245–46, 486 A.2d 1197, 1199–1200 (1985); *Adler v. American Standard Corporation,* 291 Md. 31, 42–43, 432 A.2d 464, 471 (1981); *Condore v. Prince George's County,* 289 Md. 516, 530–31, 425 A.2d 1011, 1018 (1981); *Felder v. Butler,* 292 Md. 174, 182–83, 438 A.2d 494, 499 (1981); *Williams v. State,* 292 Md. 201, 217, 438 A.2d 1301, 1309 (1981); *Kline v. Ansell,* 287 Md. 585, 590, 414 A.2d 929, 931 (1980)). As we elucidated in *Sowell:*

> "In considering whether a long-established common law rule—unchanged by the legislature and thus reflective of this state's public policy—is unsound in the circumstances of modern life, we have always recognized that declaration of the public policy of Maryland is normally the function of the General Assembly." We have recognized that the General

Assembly's failure to amend or abrogate a common law rule sometimes reflects its desired public policy.

*Sowell,* 353 Md. at 723–24, 728 A.2d at 717–18 (internal citations omitted) (quoting *Gaver,* 316 Md. at 28–29, 557 A.2d at 216 (quoting *Harrison,* 295 Md. at 460, 456 A.2d at 903)). Nevertheless, for the reasons provided *infra,* and based upon the facts of this case, we find no reason either to abandon or abjure the doctrine of necessaries.

## B.

We pause to address Petitioner's assertion that the reasoning of *Garay,* quoted *supra,* should not be applied to the case before us because it is expressed in *dicta* that should "be disavowed and rejected." *See* Petitioner's Brief at 8. During oral argument, Petitioner explained that the language quoted, *supra,* is *obiter dictum,* which, using *Black's Law Dictionary* as a reference, Petitioner defines as "[w]ords of an opinion entirely unnecessary for the decision of the case."

When a question of law is raised properly by the issues in a case and the Court supplies a deliberate expression of its opinion upon that question, such opinion is not to be regarded as *obiter dictum,* although the final judgment in the case may be rooted in another point also raised by the record. *See Scott v. State,* 297 Md. 235, 256, 465 A.2d 1126, 1137 (1983) (Murphy, C.J., dissenting); *Carstairs v. Cochran,* 95 Md. 488, 499, 52 A. 601, 601 (1902) (citing *Monticello Distilling Co. v. City of Baltimore,* 90 Md. 416, 45 A. 210 (1900)). In *Carstairs,* we noted that

[i]t may be difficult to frame a concise definition of an *obiter dictum* applicable to every such expression of opinion, and some Courts incline to the rule that the most deliberate expression of opinion, upon a question distinctly raised in the record, and fully argued by counsel, may nevertheless be regarded as a *dictum,* unless essential to the actual disposition made of the case. But as Bouvier well says: "It is difficult to see why, in a philosophic point of view, the opinion of the Court is not as persuasive on all the points

which were so involved in the cause that it was the duty of counsel to argue them, and which were deliberately passed on by the Court, as if the decision had hung upon but one point;" and in Maryland the rule is in accord with this view. In *Alexander v. Worthington*, 5 Md. 471, it is said: "All that is necessary in Maryland to render the decision of the Court of Appeals authoritative on any point decided, is to show that there was an application of the judicial mind to the precise question adjudged;" and in *Michael v. Morey*, 26 Md. 239, it was said that a decision there cited, could not be said to be *obiter dictum*, "as the question was directly involved in the issues of law raised by the demurrer to the bill, and the mind of the Court was directly drawn to, and distinctly expressed upon the subject."

*Carstairs*, 95 Md. at 499, 52 A. at 601.

Having reviewed the *Garay* language in question, *supra* at 563–564, we conclude that it ("we agree") reflects the application of this Court's judicial mind to one of the underlying questions presented in *Garay*.[13] We therefore reject Petitioner's request to abandon the principles discussed there.

## C.

Petitioner repeatedly chants the mantra that a minor does not possess the legal capacity to enter into a binding promise or contract. Specifically, Petitioner asserts that any implied or express contract she may have entered into by receiving Respondent's care should be considered void *ab initio* in light of her disability as a minor at the time. To support this contention, Petitioner relies on Maryland Rule 1–202(*l*), which

---

**13.** The Dissent (at 562) concludes that the mind of the Court in *Garay* "was never 'drawn to nor distinctly expressed upon' " the specific issue in the present case (whether a child is liable when his/her parents "inexplicably fail to pay for an isolated necessary medical cost but otherwise provide for and support the child."). Although *Garay* did not assay to define the scope of "unwilling" (because it was not called upon to do so), the Court clearly expressed its mind with regard to the subject of generally what triggers a minor's liability under the doctrine. Thus, *Garay*'s iteration that a parent's inability or unwillingness to pay were such triggers is not *obiter dicta*.

provides that "an individual under the age of 18 years" shall be considered an "Individual under disability."

■ "Generally, the law regards contractual obligations of minors as voidable, giving the minor child the choice whether to avoid the contract, or to perform it." *Garay,* 332 Md. at 367–68, 631 A.2d at 443 (citing *McBriety v. Spear,* 191 Md. 221, 60 A.2d 528 (1948); *Amey v. Cockey,* 73 Md. 297, 20 A. 1071 (1891); 4 RICHARD A. LORD, WILLISTON ON CONTRACTS, § 8:14 (4th ed. 1992)). In *Garay,* we adopted the rationale of the Supreme Court of Tennessee in *Gardner v. Flowers,* 529 S.W.2d 708 (Tenn.1975), which held that a child was liable for the medical expenses she incurred following an automobile accident. *Garay,* 332 Md. at 370, 631 A.2d at 444. In *Gardner,* the court found that, although parents are required by law to provide for their children's necessaries, a contract entered into by a minor child is presumed to be for non-necessaries and, therefore, voidable and, in some cases, even void *ab initio. Id.* (citing *Gardner,* 529 S.W.2d at 710). The *Gardner* court, however, concluded that "the inability of parents to pay for essential medical treatment for an infant renders such treatment a necessary for which the infant is liable." *Id.* (quoting *Gardner,* 529 S.W.2d at 711).

■ Contracts entered into by minor children for non-necessaries, therefore, ordinarily are only voidable. Thus, only after a minor has disaffirmed the contract for non-necessaries may the contract ordinarily be considered null and void. Notwithstanding this, a minor can be held to a contract for necessaries under certain circumstances. Under the facts of this case, Petitioner is incorrect in arguing that she, while a minor child, inherently did not possess the legal capacity to promise or contract for payment of her medically-necessitated hospital bill.

### D.

■ Petitioner suggests that Respondent should have brought the suit against Petitioner's father, as her guardian or next friend, within the applicable statute of limitations, three

years, following the provision of the treatment of Petitioner. For the purposes of this argument, Petitioner is willing to assume that Respondent possessed a valid claim and would have been awarded a judgment against her father. Although we agree that Respondent could have brought such a suit, we disagree that this was Respondent's only option. The doctrine of necessaries states that a minor may be held liable for the necessaries, including medical necessaries, which he or she is afforded when his or her parents are either unable or unwilling to pay. Consistent with this principle, Respondent, on the present facts, could have: (a) sued Petitioner, while she was still a minor, and her father; or, (b), as was done in the present case, sued Petitioner upon her reaching the age of majority.[14]

We note that both parties agree that Erie paid the proceeds from the insurance claim to Petitioner's father, facially earmarked for Respondent's charges, but the proceeds were not forwarded to Respondent.[15] Rather, the record supports that the PIP proceeds were applied by the father to

---

**14.** We need not resolve here whether the burden of production and persuasion regarding the willingness or ability of Petitioner's father to pay for her treatment would rest with Respondent as elements of its claim or with Petitioner as a defense to the claim against her as an individual. To the extent that her father's willingness or ability to pay could have been plead and proven as a defense, she did not argue as such in either the District Court or the Circuit Court.

Moreover, even as Petitioner's argument goes, Respondent's suit against Petitioner was brought within three years of providing the medical treatment and, obviously, within three years of her reaching adulthood. The treatment was provided on 7–8 March 1997. Petitioner became eighteen on 22 December 1998. Suit was filed on 12 November 1999.

**15.** Petitioner notes in her brief that Respondent asserted in the Circuit Court that the Erie benefits check "was cashed with the proceeds being kept by [Petitioner's] father." *See* Petitioner's Brief at 7. Petitioner apparently concedes that her father received the money from Erie. *See* Petitioner's Brief at 8. Respondent notes in its brief that Petitioner admits that "[t]he vehicle driven by [Petitioner] was totally destroyed and promptly replaced by the father." *See* Respondent's Brief at 10 (quoting Petitioner's Brief at 9).

purchase a replacement automobile for Petitioner.[16] Ordinarily, an automobile is not a necessary a parent is required to furnish to a minor child. There is no evidence in this record that having an automobile was a necessary, within the meaning of the doctrine of necessaries, for Petitioner. The father's refusal to apply the insurance proceeds to the debt owed Respondent—the existence of which he was well aware of as it was the facial premise for which he and Petitioner applied to Erie in the first place—is a clear indication of his unwillingness to pay for Petitioner's medical expenses at a time fairly contemporaneous with the provision of the medical services, i.e., within 60 days. We agree with the Circuit Court, which found that, as an adult, Petitioner is liable for the medical treatment expenses which she incurred while a minor. We find no error in the Circuit Court's conclusions that Petitioner could be held liable for those medical expenditures provided for her benefit under the doctrine of necessaries, which trumps her defense that she was under the disability of minority when she entered into the implied promise to pay Respondent for the needed medical treatment. Lastly, we agree that the record supports that Petitioner's father was unwilling to pay for his then minor daughter's medical necessaries, which, in turn, left Petitioner primarily liable for the debt to Respondent.[17]

---

**16.** Petitioner's attorney, in the Circuit Court, stated that the "PIP money" was used "to buy her [Petitioner] a new car." Prior to that, the record only vaguely hinted how the PIP proceeds were utilized by Mr. Schmidt, Jr., i.e., "provided to Michelle to use for items not related to [Respondent]." See letter of 22 March 2000 from Erie's claims supervisor to Petitioner's attorney.

**17.** On this record, Petitioner may have been able to implead her father in this litigation, whose parental duties during Petitioner's minority included paying for her necessaries, such as the medical expenses in issue. If Petitioner's father was able, but merely unwilling, to pay for her medical necessaries, it would not violate public policy for Petitioner, as an adult, to sue her parent for failure to provide for her necessaries. We note that

[t]he principal public policy in support of the judicially created parent-child immunity doctrine is "the protection of family integrity and harmony and of parental discretion in the discipline and care of

## E.

Lastly, Petitioner offers us the following hypothetical as a means of demonstrating why the doctrine of necessaries places minors unreasonably at risk for future lawsuits.

---

the child...." *Eagan v. Calhoun*, 347 Md. [72,] 75, 698 A.2d [1097,] 1099 [(1997)]

\* \* \*.

Under circumstances where the public policy reasons underlying parent-child immunity in tort actions have no application, i.e., under circumstances where, at the time of the tort action, there is no parent-minor child relationship which will be disrupted by the tort suit, this Court has generally held that the suit is not barred by the doctrine of parent-child immunity. See *Eagan*, 347 Md. at 76–77, 698 A.2d at 1099 1100 (In prior cases, "we essentially adopted the view ... that, although the doctrine was useful within the bounds of a normal parent-child relationship, it had no rational justification where the foundation did not exist"); *Warren v. Warren*, 336 Md. 618, 650 A.2d 252 [(1994)] (majority opinion), 336 Md. 618 at 631, 650 A.2d 252, 258 (Raker, J., concurring) (Parent-child immunity doctrine does not bar a child's negligence action against his stepparent; as emphasized in the concurring opinion, the stepparent did not stand *in loco parentis* to the child); *Hatzinicolas v. Protopapas*, 314 Md. 340, 357, 550 A.2d 947, 956 (1988) (Parent-child immunity is inapplicable to a tort suit brought by a minor child against her father's business partner, even though the father and business partner may have been joint tortfeasors and the partner might be able to obtain contribution from the father, with the Court stating: "Preservation of the family interests ... does not require that we extend *parent-child immunity to bar any recovery from a parent's partner")*; *Waltzinger v. Birsner*, 212 Md. 107, 128 A.2d 617 [(1957)] (An emancipated child may sue his or her parent in tort); *Mahnke v. Moore*, 197 Md. 61, 68, 77 A.2d 923, 926 (1951) ("there can be no basis for the contention that the daughter's suit against her father's estate would be contrary to public policy, for the simple reason that there is no home at all in which discipline and tranquility are to be preserved").

The above-cited cases clearly reflect the principle that the court created doctrine of parent-child immunity is inapplicable where a parent-minor child relationship does not exist and where, consequently, the public policy underlying the doctrine would not be served.

*Bushey v. Northern Assur. Co. of Am.*, 362 Md. 626, 653–56, 766 A.2d 598, 612–613 (2001) (Eldridge, J., concurring). In this case, parent-child immunity is inapplicable where Petitioner has reached the age of majority and, therefore, a parent-minor child relationship no longer exists. Permitting such under the circumstances of this case would operate to vindicate the strong public policy (and, indeed, the law, *see* Family Law Art. § 5–203(b)(1)) that a parent may not avoid lightly his or her primary responsibility to provide for a child's necessaries. This blunts the Dissent's criticism that our resolution of the present case reduces the pressure on parents to fulfill their primary responsibility. *See* Dissent, at 568–569.

A newborn child receives emergency medical care soon after birth which resulted in its survival. As counsel for the hospital I could immediately file suit, without notice, to hold the newborn liable for the unpaid bill alleging the necessaries doctrine as a basis for liability. The parent or guardian fails to establish that it is unable to pay the bill. A judgment is entered personally against the newborn infant in favor of the hospital. Alternatively, as counsel I could wait for a period of 18 years and sue the former newborn infant as an adult, obtain judgment, and then attach this child's wages to satisfy the judgment as was done exactly in this case. As counsel for the hospital I could file suit in all such cases to avoid collection efforts and hiring an accounts representative.

Petitioner's Brief at 10.

In *Garay*, we cautioned that "whether a parent or guardian is able and willing to supply necessaries varies from jurisdiction to jurisdiction and is heavily dependent on the facts of each individual case." *Garay*, 332 Md. at 369, 631 A.2d at 444. The evidence of record indicates that Petitioner's father applied for and received benefits from Erie ostensibly for payment of Respondent's bill, but instead applied the proceeds toward a replacement vehicle for Petitioner. Our decision in this case is dependent upon the fact that Petitioner's father diverted the PIP proceeds earmarked for Respondent's bill to other purposes, which brings this case within the limitations delineated in *Garay* that permit a minor to be held liable for medical necessaries that his or her parents are unable or, as in the case here, unwilling to pay. Thus, in Petitioner's hypothetical, should a hospital immediately file suit against the minor under the doctrine of necessaries, the minor's likely defense would be that, under *Garay* and *Pepper*, the minor's parents would be liable to pay for the medical necessaries of their child. If the minor's parents were "truly unable to pay for such expenses, leaving the child or his or her estate potentially bound in contract, principles of reciprocity [would]

demand that the child be given the opportunity to recover those expenses from the wrongdoer." *Pepper*, 346 Md. at 694, 697 A.2d at 1365 (citing *Garay*, 332 Md. at 371, 631 A.2d at 445). If no wrongdoer existed, as in Petitioner's hypothetical, then the minor ultimately would be responsible for the debt. Should the hypothetical hospital wait until the minor reached the age of majority to sue to recover the medical expenses under the doctrine of necessaries, the defendant could defend on the basis that his or her parents had been able or willing to pay for his or her medical necessaries at the time of incursion while he or she was a minor. Failing such proof, the greater public policy dictates that the former patient pay for the benefits received when given the medically-necessary care by the hospital. Whatever unfairness may inhere in this principle is overweighed by the consideration of not placing hospitals and other emergency health care providers in a situation where financially-able individuals might avoid paying for necessary medical treatment.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

Dissenting Opinion by RAKER, J., in which BELL, C.J., and ELDRIDGE, J., join.

RAKER, Judge, dissenting, joined by BELL, C.J., and ELDRIDGE, J.:

Today the majority restates a fairly common rule regarding a minor's liability for the cost of medical necessities: where a parent is unable or unwilling to pay for a minor child's necessary emergency medical treatment at the time of incursion of the treatment, the child, upon reaching the age of majority, may be held liable under the doctrine of necessities for the cost of the medical care. Maj. op. at 542–544. Other courts have employed similar rules, finding minors liable for necessary medical treatment where the parents are unable, refuse, or fail to provide for such treatment. *See* John D. Hodson, Annotation, *Infant's Liability for Medical, Dental, or Hospital Services,* 53 A.L.R.4th 1249 (2001). Applying this

rule to the case before us, the majority finds the petitioner liable for the cost of medical care rendered while she was a minor. The majority reasons that the failure of petitioner's father to apply the insurance proceeds recovered after petitioner's accident towards the cost of petitioner's medical care is "a clear indication of his unwillingness at the time to pay for petitioner's medical expenses at a time fairly contemporaneous with the provision of medical services, i.e., within 60 days." Maj. op. at 555.[1]

I disagree with the majority's holding for two reasons. First, the majority finds the petitioner's father unwilling to pay for her medical bills without discussing what constitutes unwillingness. Indeed, the majority's reasoning is based largely on cases that do not touch on the meaning or import of unwillingness. Second, this State's common law and statutory law does not support the proposition that a child, supported by his or her parents, should be held responsible for isolated necessary medical costs that the parents fail to pay. Despite the fact that parents are obligated by statute to support their children, the majority leaves minors who are supported by their parents liable for their parents' choices, regardless of what those choices are or whether the choices actually reflect unwillingness to pay for necessary medical care.

The majority finds petitioner liable to respondent because her father was *unwilling* to pay for petitioner's medical expenses, not because her father was *unable* to pay. As stated above, the majority believes that the father's failure to use insurance proceeds to pay the hospital for his daughter's medical bills is a "clear indication" of his unwillingness to pay for petitioner's medical expenses. Maj. op. at 555. There is

---

1. It is not entirely clear why the passage of sixty or more days matters. The time frame set out by the majority raises the question whether the majority would find petitioner's father unwilling to pay for his daughter's medical expenses if he had spent the insurance proceeds sixty-five days, ninety days or a year after the accident. Setting out such a time frame does little, if anything, in the way of providing us or prospective litigants with a means to determine whether a parent is unwilling to pay for a child's medical bills.

little case law in this State, or any other state, to help us decide when a parent is unwilling to pay for his or her child's necessary medical costs. What little law there is, however, suggests that where a child is supported by his or her parents, the parents' failure or default on a single necessary expense does not usually render the child liable for that expense.[2]

As support for its reading of "unwilling," the majority relies on a circular reading of two decisions: *Garay v. Overholtzer*, 332 Md. 339, 631 A.2d 429 (1993), and *Johns Hopkins Hosp. v. Pepper*, 346 Md. 679, 697 A.2d 1358 (1997). Both *Garay* and *Pepper* held that a minor may recover medical expenses from the tortfeasor who caused the minor's injuries. While neither case involved a minor sued for unpaid medical expenses, in order to justify allowing a minor to sue a tortfeasor for medical expenses, both cases relied on the following reasoning: "when parents are unwilling or truly unable to pay for such expenses, leaving the child or his or her estate potentially bound in contract, principles of reciprocity demand that the child be given the opportunity to recover those expenses from the wrongdoer." *Pepper*, 346 Md. at 694, 697 A.2d at 1365; *Garay*, 332 Md. at 371, 631 A.2d at 445. Thus, in order to reach the conclusion that the child should be able to recover medical expenses from a tortfeasor, both *Garay* and *Pepper*

---

**2.** In finding petitioner liable, the majority states that it is "mindful of the distinction made by some states that a singular episode of a parent's refusal to pay for a child's necessaries might not satisfy the state's view of adequate evidence of 'unwillingness' so as to trigger the minor's liability." Maj. op at 549. Nonetheless, the majority finds that "[o]ver-weighing the arguable unfairness to the minor in the balancing, at least in the present case, is the consideration of not placing hospitals ... in a situation where apparently financially-able individuals may avoid pay-ing for necessary medical treatment through a contrivance similar to that demonstrated on the record of this case." *Id.* at 549.

We agree that the hospital should be paid. The hospital, however, should have sought recovery from petitioner's father rather than wait-ing to sue petitioner. The majority's decision to protect the hospital despite the hospital's failure to determine whether petitioner's father was actually unwilling to pay for petitioner's medical bills will leave children liable even where it is the parent and not the child who contrives to avoid paying an isolated medical cost.

assumed, without analysis, that a child is liable for medical expenses when the parents are unable or unwilling to pay.

Despite the fact that *Garay* and *Pepper* did not touch on the implications of finding a child liable for medical costs, the majority reasons as follows:

"The rationales underlying *Garay* and *Pepper* recognize that public policy and justice demand that an injured minor have the right to recover incurred medical expenses from a third-party tort-feasor, where the child's parents are unable or unwilling to pay for those expenses, *because the medical provider may sue to recover them* . . . . By parity of reasoning, it would seem that such a child, upon attaining adulthood, may be liable in contract to pay for medical necessaries provided to him or her while a minor, if the parents were unable or unwilling to pay for such necessaries."

Maj. op. at 545–546 (emphasis in original). Unfortunately, there is no parity between *Garay, Pepper* and the case before us. As stated above, *Garay* and *Pepper* did not attempt to delve into the meaning of "unwilling." [3]

By restating an unanalyzed assumption in *Garay* and *Pepper* as its conclusion, the majority leaves us with no guidance as to when a parent should be found unwilling to pay for their child's necessary medical expenses. All we are left with is the majority's conclusory and, I believe, incorrect statement that the father's failure to turn over insurance proceeds to the plaintiff is a "clear" indication of the father's unwillingness to pay. This provides no clearer a definition of unwillingness than did this Court's opaque statement in *Garay:* "Most courts appear to recognize this formulation of the necessaries doctrine, but the determination of whether a parent or guardian is able and willing to supply necessaries varies from jurisdiction to jurisdiction and is heavily dependent on the facts of each individual case." *Garay,* 332 Md. at 369, 631 A.2d at 444.

---

3. *Garay* followed the rationale of *Gardner v. Flowers,* 529 S.W.2d 708 (Tenn.1975), which focused on whether a minor's mother was *unable* to pay for the minor's necessities.

The majority also brushes aside petitioner's argument that *Garay's* discussion of willingness constitutes *obiter dictum*. Specifically, the majority states that when a question of law is raised by the issues in a case and the Court supplies a deliberate expression of its opinion upon that question, such opinion is not to be regarded as *obiter dictum*. This appears to be a sensible definition, but in applying it, the majority relies on a long quotation from *Carstairs v. Cochran*, 95 Md. 488, 52 A. 601 (1902). In *Carstairs*, this Court stated that "[a]ll that is necessary in Maryland to render the decision of the Court of Appeals authoritative on any point decided, is to show that there was an application of the judicial mind to the precise question adjudged." *Id.* at 499–500, 52 A. at 601 (quoting *Alexander v. Worthington*, 5 Md. 471–72 (1854)). Relying heavily on this one sentence, the majority concludes that in *Garay*, this Court applied its "judicial mind" to the issue of unwillingness when we wrote that "we agree" that the doctrine of necessaries is sufficient to hold a minor child liable for medical expenses if it can be shown that his or her parent is unwilling or truly unable to pay them. Maj. op. at 555 (citing *Garay*, 332 Md. at 371, 631 A.2d at 445). If a mere statement of agreement with a very broad rule constitutes an application of this Court's judicial mind to single word within that rule, then I fear we have expanded the precedential value of our decisions to the point of absurdity.

If the majority had relied on a more complete reading of *Carstairs* and assessed the scope of this Court's decision in *Garay*, I believe it would have reached a different conclusion as to the impact of *Garay* on the case before us. In the sentence from *Carstairs* immediately following that relied upon by the majority, this Court provided some guidance as to what is meant by "application of the judicial mind." We explained that "in *Michael v. Morey*, 26 Md. 239, it was said that a decision there cited, could not be said to be *obiter dictum*, 'as the question was directly involved in the issues of law raised by the demurred to the bill, and the mind of the court was directly drawn to and distinctly expressed upon the subject.'" *Carstairs*, 95 Md. at 500, 52 A. at 601.

Even a quick reading of *Garay* reveals that in order to reach the conclusion that a child should be able to sue a tortfeasor for medical expenses, this Court relied, without analysis, on the principle that a child may be liable for medical care where the parents are unwilling to pay. We did not address, even tangentially, the issue in this case: whether a child may be held liable when his or her parents inexplicably fail to pay for an isolated necessary medical cost but otherwise provide for and support the child. The mind of this Court was never "drawn to nor distinctly expressed upon" this subject.

Rather than analyze the situations in which a parent could be found unable or unwilling to pay for a child's necessary medical care, the *Garay* court simply observed that:

"Most courts appear to recognize this formulation of the necessaries doctrine, but the determination of whether a parent or guardian is able and willing to supply necessaries varies from jurisdiction to jurisdiction and is heavily dependent on the facts of each individual case."

*Garay*, 332 Md. at 369, 631 A.2d at 444. This observation explicitly disclaims any attempt to set out the circumstances under which a parent may be found unwilling to pay for a child's necessary medical care. Therefore, *Garay's* reference to the liability of a child resulting from a parent's unwillingness to pay for medical costs does not help answer the question before us, and should, as petitioner argues, be regarded as *dictum*.

Those cases that do appear to touch on the question of willingness have generally found parents unwilling to pay for necessary medical expenses in three situations: first, where the parent has abandoned the child; second, where the parent contributes absolutely nothing to the child's support; and third, where the child or parent has recovered medical expenses from the tortfeasor.[4] The case before us does not fall

---

**4.** It is important to note that none of these cases, nor any presented by the majority, deals solely with the question of unwillingness. Certainly, none of the cases we have found confront a scenario like that before us, where a father who otherwise provides for his child inexplicably fails to

into any of these categories, and I see no reason, particularly on this record, to hold the petitioner liable for medical expenses incurred while she was a child and supported by her parents.

It is sensible to hold that a parent who has truly abandoned a child is unwilling to pay for anything for the child, including medical care. In *In re Dzwonkiewicz's Estate,* 231 Mich. 165, 203 N.W. 671 (1925), the Supreme Court of Michigan found a child liable for emergency medical care given the child. The child's father had abandoned the family. *Id.* In *Westrate v. Schipper,* 284 Mich. 383, 279 N.W. 870 (1938), the court found that in *Dzwonkiewicz,* the question of inability or unwillingness was easily settled because the father had abandoned the child. *Id.* at 872. In contrast, *Westrate* involved a child who was living at home with her parents at the time medical care was provided. The court found that under such circumstances the child could not be liable, absent proof that the child's father was "not willing and able to pay for the necessaries." *See id.* at 871–72.

It is also reasonable to find a parent unwilling to pay for the child's medical care where the parent contributes nothing to the child's support. In *Trainer v. Trumbull,* 141 Mass. 527, 6 N.E. 761 (1886), the Supreme Judicial Court of Massachusetts stated:

> "[A]n infant who is already well provided for in respect to board, clothing and other articles suitable for his condition is not to be held responsible if any one supplies to him other board clothing, & c., although such person did not know that the infant was already well supplied. So, on the other hand, the mere fact that an infant, as in this case, had a father, mother, and guardian, *no one of whom did anything towards his care or support,* does not prevent his being bound to pay for that which was actually necessary for him when furnished."

pay for the child's necessary medical care after the cost of the care is incurred.

*Id.* at 762 (emphasis added) (citations omitted). Likewise, in *Strong v. Foote*, 42 Conn. 203 (1875), the Supreme Court of Errors of Connecticut found a child liable for the cost of necessary dental work where the child's guardian did not show any effort or intention to repair or preserve the child's teeth. *Id.* at 205.

Finally, some courts have found parents unwilling to pay for their child's necessary medical care if the child recovers damages for medical costs from the tortfeasor and the parent nonetheless refuses to pay for the care. This line of cases started with *Cole v. Wagner*, 197 N.C. 692, 150 S.E. 339 (1929), where the Supreme Court of North Carolina stated:

"[W]e do not think that the fact in regard to his father's usual support can absolve the infant from liability, under the facts and circumstances of this case. The infant was seriously injured, and by fair inference was immediately taken to the hospital and his life and usefulness was saved by the hospital, medical and surgical attention. . . . During the period of treatment the father paid for no hospital, medical or surgical treatment for the infant. It seems that he was either unable, at least he did not provide for the infant. . . . The infant now has an estate, and it is unthinkable that the guardian of the infant would not pay the reasonable expense for saving the child's life and usefulness."

*Id.* at 341. Similarly, in *Bitting v. Goss*, 203 N.C. 424, 166 S.E. 302 (1932), the court found *Cole* controlling where the minor had recovered damages from the tortfeasor, the father had recovered damages for medical expenses, and the father subsequently refused to pay the medical care provider.

The rule in *Cole*, that a child living with his parents may be liable for the parents' unexplained failure to pay for the child's necessary medical care, has generally been limited to situations where the child recovered damages from the tortfeasor for medical costs. In *Madison Gen. Hosp. v. Haack*, 124 Wis.2d 398, 369 N.W.2d 663 (1985), the Supreme Court of Wisconsin stated that "courts may view the *Cole* rule as applicable only to situations in which the child's estate consists

of damages which include recovery for medical and hospital expenses." *Id.* at 667. *See also Greenville Hosp. Sys. v. Smith,* 269 S.C. 653, 239 S.E.2d 657, 659 (1977) ("in *Cole,* the North Carolina Court permitted the recovery from the minor's estate because the estate consisted of damages recovered by the minor's guardian which included medical and hospital expenses"); *Lane v. Aetna Casualty & Surety Co.,* 48 N.C.App. 634, 269 S.E.2d 711, 716 (1980) ("Unlike the situation in *Cole,* in this case there is no issue of a separate estate or recovery in damages . . . .").

*Cole* and the cases following it thus reach the fair and defensible conclusion that where a minor has recovered damages to pay for the cost of medical care, the care provider should be able to recover those costs from the minor. As the court found in *Cole,* to allow a child to recover damages for medical expenses incurred by the child and then deny the care provider the right to recover its costs from the child, "would be blowing hot and cold in the same breath." *Cole,* 150 S.E. at 341.

These three readings of "unwilling" hold a child liable for necessary medical costs only if it is relatively certain that the parents cannot pay for the expenses or if the child has recovered damages for the very costs the medical care provider is seeking. The cases do *not* hold the child liable where the parents, who otherwise support their child, fail to pay for isolated medical expenses. Moreover, the cases, other than *Cole* and its progeny, determine the issue of unwillingness based on the parent's conduct *before* the child required medical care. This makes sense because basing a finding of unwillingness on the parents' conduct *after* medical expenses are incurred would enable parents who otherwise support their children to selectively avoid paying for costs of necessary medical expenses.

In those cases following *Cole,* unwillingness is determined after medical costs are incurred. *Cole* does not apply to the case before us for two reasons. First, the petitioner did not personally recover any medical expenses from the tortfeasor.

Therefore, if the petitioner is found liable, she will not be able to pay the costs out of her recovery from the tortfeasor. The second reason Cole does not apply here is that courts following *Cole* have looked for clear proof of the parents' unwillingness to pay. In *Bitting,* the plaintiff contacted the parents who affirmatively refused to pay. The court observed that the "plaintiff has demanded payment for said services from T.R. Goss [the father], but no part of the said reasonable value of the services has been paid, and the said T.R. Goss has at all times and still refuses to pay the same or any part thereof." *Bitting,* 166 S.E. at 302. Here, by contrast, it does not appear from the record that the father was contacted by the hospital until the time his daughter had reached majority and was sued by the hospital.[5] So far as I can tell from the record, the father never affirmatively refused to pay the hospital. Since the father was otherwise supporting his daughter, without further proof, there is no basis for concluding that his failure to use insurance proceeds to pay for her medical care reflects unwillingness to pay.

In contrast to all of the cases discussed above, the majority's result would enable petitioner's father to spend the insurance proceeds on whatever he pleased, leaving his daughter liable to the hospital. Despite the fact that the father supported petitioner during her childhood, the father could have, in this instance, used the funds for his own purposes rather

---

**5.** The record is unclear whether the father or the grandfather received the bills for petitioner's medical expenses and the insurance proceeds from the insurance carrier. As the majority points out, petitioner's counsel was not clear as to whether the petitioner's father or grandfather received the insurance proceeds. Maj. op. at 539 n. 4. The facts on this issue are made more confusing by the fact that the check from the insurance company was made out to Lewis Schmidt without any indication whether the money was directed to the father, Lewis Schmidt, Jr., or the grandfather, Lewis Schmidt, Sr. A letter from Erie Insurance Group to petitioner's counsel states that the Lewis Schmidt, Jr., was the "Erie Insured," while Lewis Schmidt, Sr., was counsel's client. Finally, petitioner's lawyer argued before the Circuit Court that all the bills for petitioner's medical expenses were sent to petitioner's grandfather rather than her father.

than pay his daughter's medical bills, thereby rendering her responsible for this necessary cost.

The majority's holding is made more troubling by the fact that the record is anything but clear as to the father's unwillingness to pay for his daughter's medical costs. The majority recounts the father's actions in recovering money for his daughter's injuries as follows:

"Soon after her release from the hospital, petitioner filed for benefits under the coverage provided in her father's Erie policy. During the claim process, petitioner and her father provided several documents to Erie regarding her medical expenses. On 16 March 1997, petitioner and her father signed a Disclosure Authorization, authorizing petitioner's treating physician to furnish Erie with records of her post-accident treatment. On 1 May 1997, petitioner and her father signed an Assignment and Authorization of benefits under the PIP coverage instructing and directing Erie to pay directly to her treating physician the amount owed him."

Maj. op. at 539. Contrary to the majority's reading of these facts, it seems equally reasonable to conclude that the father was, in fact, willing to pay for his daughter's medical expenses. Why else would he have assigned the benefits to his daughter's doctor? It is not at all clear that the father, who supported his daughter during her youth and assigned the insurance benefits to his daughter's physicians, was unwilling to pay for his daughter's necessary medical costs.

The majority also fails to acknowledge that, as mentioned above, the hospital failed to contact the father until suit was brought in this case. The hospital had no first hand knowledge that the father was unwilling to pay. Despite respondent's protestations, there is no reasonable excuse for not having inquired of the father. The hospital admits that it had the father's name and phone number before the District Court trial. In this day and age, a name and phone number usually is enough information to contact a person. Again, I see no basis, certainly not a clear one, for claiming that the father's

actions indicate unwillingness to pay for his daughter's medical bills.

In *Garay,* Judge Karwacki, writing for the Court, pointed to *North Carolina Baptist Hospitals v. Franklin,* 103 N.C.App. 446, 405 S.E.2d 814 (N.C.991), as an example of a case where parents were found willing and able to pay for their child's necessary medical costs. *Garay,* 332 Md. at 369, 631 A.2d at 444. As in this case, the parents in *Franklin* never paid for a necessary medical cost incurred by their child. The court, however, refused to find the parents unwilling or unable to pay because they had requested the medical care and agreed to pay for it. *Franklin,* 405 S.E.2d at 816. Unlike the parents in *Cole,* who had done nothing to obtain necessary medical treatment for their child, the parents in *Franklin* had "done everything that any parent could possibly do for its child in regard to necessaries except pay for them after the debt was incurred." *Id.* at 817. The court concluded that "[t]o hold otherwise . . . would make children the guarantors of their parents' debts for clothes, lodging, schooling, medical care and other necessaries." *Id.* In the case before us, the petitioner's father is more similar to the parents in *Franklin* than the parents in *Cole* or the other cases discussed above. Petitioner's father had done all the things a parent would do under the circumstances except pay for the debt incurred.

The majority's analysis of unwillingness is also out of synch with Maryland Code (1957, 1999 Repl. Vol., 2000 Supp.), § 5–203(b)(1) of the Family Law Article, which provides that the parents of a minor child "are jointly and severally responsible for the child's support, care, nurture, welfare, and education. . . ." This Court repeatedly has found that the obligation placed upon a parent to provide for the care and welfare of a minor is "not a perfunctory one, to be performed only at the voluntary pleasure or whimsical desire of the parent." *Palmer v. State,* 223 Md. 341, 351, 164 A.2d 467, 473 (1960); *Middleton v. Middleton,* 329 Md. 627, 633, 620 A.2d 1363, 1366 (1993).

In keeping with the statutory view of a parent's duty to provide for a child's care, petitioner's father should not be allowed to escape liability for the costs of medical care merely because he decided, *after* the care was rendered, not to transfer insurance proceeds to the care provider. This is particularly true where the record indicates that the hospital never contacted the father to determine whether he was willing to pay. The majority altogether ignores that the respondent agreed at oral argument that under this statute, even if the parents are truly unwilling to pay for medical care given their child, the parents, not the child, should be sued because liability is a statutory responsibility, irrespective of unwillingness.

It is also important to note that the majority's application of *Garay* and *Pepper* distorts the meaning of disability. Maryland Rule 1–202(*l*) defines a person under disability as "an individual under the age of 18 years or an individual incompetent by reason of mental incapacity." As the majority acknowledges, minors are under a disability and their contracts are therefore voidable. Maj. op. at 542. A minor under disability is not merely shielded from suit until the age of eighteen. He or she may always defend on the basis of disability, even after reaching the age of majority.

As a result of the majority's erroneous application of *Garay,* in a case where parents inexplicably fail to pay the hospital fees associated with their child's birth, the hospital is now relieved of any responsibility to notify the child's parents of the hospital's intent to sue. Instead, the hospital may wait eighteen years until the child reaches the age of majority. Thereafter, the hospital may sue the child rather than the parent even if the parents raised and supported the child until the age of majority and paid for all other necessary costs. This fundamentally changes the meaning of disability. The focus of the inquiry regarding disability is no longer on the overall state of the child's relationship with his or her parents, but on the parents' decision to pay a single necessary medical cost after the cost is incurred.

Under the majority's reasoning, a child, upon turning age eighteen, may become liable for any necessary medical cost that the child's parents neglected to pay. The child is liable whether or not the claimant ever asks the parents if they are willing to pay. The child is liable even where the parent inexplicably chooses a single occasion on which they will not pay for their child's needs. This manner of piercing the shield of disability stands in stark contrast to the cases discussed above, where there was strong evidence that no one other than the child was or would be willing to pay for the medical care. In those cases, it was almost certain that the medical care provider would not be able to recover from anyone if the child was not forced to pay. The majority's reasoning transforms disability from a shield protecting those too young to be bound to contracts into a starting gate, after which medical care providers are free to sue children for even the most isolated cost that the child's parents inexplicably fail to pay.

In closing, I believe that the majority should have exercised greater caution in finding that petitioner's father was unwilling to pay for his daughter's medical bills. In *Pepper*, we confronted the question whether a family with a combined income of $21,000, two children, and pre-majority medical expenses for one child in excess of $1,100,000 was able to pay for their child's medical expenses. Although the inability of the parents to pay for their child's medical bills may have been more obvious in *Pepper* than the father's unwillingness to pay in this case, we did not decide whether the parents were in fact unable to pay. Instead, we wrote:

"Whether or not parents are able to afford necessary medical care for their negligently injured minor child will vary from case to case according to the circumstances of the parties involved, including, but not limited to, parental income, existing financial assets and obligations, the number of children in the family, available insurance coverage, the cost of living and inflation rate, whether or not both parents work, or are even capable of working in light of the child's injuries, and other economic and non-economic factors too numerous to list. It will also vary, of course, on the nature

of the injury and the duration and manner of treatment. These infinitely variable factors preclude a bright line rule concerning the standard by which the affordability determination can be made. More often than not, juries will have to decide with the aid of expert and lay testimony when necessary, whether and to what extent an injured child's medical necessaries exceed the financial ability of the parents."

346 Md. at 701, 697 A.2d at 1369. Likewise, in *Greenville Hosp. Sys. v. Smith,* 269 S.C. 653, 239 S.E.2d 657 (1977), the Supreme Court of South Carolina was faced with a case where a minor's parents failed to make any payment on their son's hospital bill and the record did not indicate whether this was due to their inability or unwillingness to pay. The court found that:

"Mr. and Mrs. Smith have not pursued their right of action to seek recovery of the expenses they incurred for Kenneth's medical and hospital treatment. Except for their continued failure to pay, nothing in the record indicates Kenneth's parents are unable to pay the hospital bill. Absent such a showing, respondent must look to Mr. and Mrs. Smith for payment."

*Id.* at 658–59. The court therefore remanded to the probate court to determine if Kenneth's parents were able to discharge their obligation to pay his hospital expenses. *Id.* at 659. The court in *Smith,* like this court in *Pepper,* was extraordinarily careful in finding a child liable for his or her parents' failure to pay for necessary medical costs.

For all the reasons stated herein, I respectfully dissent. To recap, I find that the majority's reading of this Court's opinions in *Garay* and *Pepper* fails to provide a workable definition of unwillingness on the part of a parent to pay for necessary medical expenses. I also believe that the majority's analysis is out of step with our statutory and common law regarding the parental duty to care for children and the meaning of disability. In the future, unless a case falls into one of the three categories of cases where courts have found a

child's parents unwilling to pay for the child's necessary medical care, I would not hold the child responsible for the parents' choices.

Chief Judge BELL and Judge ELDRIDGE join in this dissenting opinion.